R. Derry CROSBY, D.O., Plaintiff,

v.

HOSPITAL AUTHORITY OF VAL-
DOSTA and Lowndes County,
et al., Defendants.

Civ. A. No. 90–23–VAL (WDO).

United States District Court,
M.D. Georgia,
Valdosta Division.

Jan. 12, 1995.

Olin Wayne Ellerbee, Valdosta, GA, and Lewis H. Markowitz, York, PA, for plaintiff.

William Gus Elliott, Valdosta, GA, and Joseph William Watkins, Sidney F. Wheeler, and Debra E. LeVorse, Atlanta, GA, for defendants.

### ORDER

OWENS, Chief Judge.

Before the court is defendants' motion for summary judgment. Plaintiff, an osteopathic doctor, has sued defendants claiming that their refusal of orthopedic surgical staff privileges to him constitutes a violation of federal and state antitrust laws. Defendants contend that one of several immunities entitles them to summary judgment. After careful consideration of the arguments of counsel, the relevant caselaw, and the record as a whole, the court issues the following order.

## I.  INTRODUCTION

R. Derry Crosby, a doctor of osteopathy, is the plaintiff in this case. On March 14, 1990, he filed a complaint against defendants— Lowndes County Hospital Authority ("Authority"), d/b/a South Georgia Medical Center ("SGMC"), the Board Members of the Authority, and the staff physicians who participated in a decision to deny him orthopedic surgical staff privileges ("staff members"). Plaintiff's complaint challenges defendants' actions in denying him orthopedic surgical staff privileges.

In his complaint, plaintiff alleges four theories of recovery based upon defendants' conduct—the first two presenting federal questions, the latter two premised upon state law. Plaintiff's first and second claims, respectively, assert defendants' conduct was a restraint of trade in violation of 15 U.S.C. § 1 and that the same conduct amounted to monopolization, or an attempt to monopolize, in contravention of 15 U.S.C. § 2. Plaintiff's third claim, based on state law, is apparently founded on Official Code of Georgia Annotated ("O.C.G.A.") § 16–10–22, and the fourth on whatever common law prohibitions Georgia might possess. The court says "apparently" since plaintiff's complaint and brief failed to cite a code section supporting his state antitrust claim, and failed to cite to any Georgia cases enunciating common law antitrust prohibitions. Plaintiff's lawsuit by agreement of counsel is now limited to antitrust violations. Transcript of In–Chambers Conference of 3/6/92, at 37.

Defendants' initial responsive pleading was accompanied by their motion to dismiss and brief in support thereof. Defendants first asserted the "state action" doctrine, originally enunciated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), as the source of an absolute immunity from suit. As an alternative, defendants raised the Local Government Antitrust Act ("LGAA"), 15

U.S.C.A. §§ 34–36 (Supp.1994), which they claimed precluded a damages award against them. Defendants also pointed to the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C.A. §§ 11101–11152 (Supp.1994), as providing peer review groups and their members an immunity from damages. As to the state law claims, defendants argue that they have been statutorily immunized, *see* O.C.G.A. §§ 36–65–1 and –2 (Supp.1993), from state antitrust liability.

Because matters outside the pleadings would necessarily be considered, the court elected to treat defendants' motion to dismiss as a summary judgment motion in accordance with Federal Rules of Civil Procedure ("Fed.R.Civ.P.") 12(c) and 56. The court held the motion in abeyance, however, as the parties indicated that there was a realistic prospect of settlement. Consequently, plaintiff's responsive brief was not filed until September 1, 1994.

## II. UNDISPUTED MATERIAL FACTS

When plaintiff filed his complaint in 1990, he was thirty-seven years of age. After graduating from Valdosta State College, plaintiff unsuccessfully applied to the Medical College of Georgia ("MCG"), the University of Florida Medical School, and Emory Medical School for a doctor of medicine ("M.D.") program. He then enrolled in and completed a one year course of study at MCG to become a physician's assistant. Plaintiff then reapplied unsuccessfully to enter MCG's M.D. program. Only his subsequent application to the West Virginia College of Osteopathy, an osteopathic medical school, was accepted.

Plaintiff successfully matriculated for four years at the West Virginia College of Osteopathy earning a Doctor of Osteopathy ("D.O.") degree. He then completed a one year osteopathic internship at Memorial Hospital in York, Pennsylvania, and remained there to complete an osteopathic orthopedic surgical residency program. This rendered plaintiff eligible to take his osteopathic board exams. On August 9, 1990, counsel for plaintiff advised the court that plaintiff had just completed his "oral" osteopathic orthopedic exams, but had not yet received the results.

On September 20, 1986, plaintiff applied for orthopedic surgical staff privileges at SGMC. His application was duly considered and denied.[1] Defendants have testified that all actions taken by them were within the scope of their duties as staff, committee, or board members. Plaintiff nowhere alleges that any defendant acted outside the scope of his or her duty as a member of either the board or one of the various credentialing committees of defendant-Authority.

SGMC has adopted bylaws governing the application process for surgical privileges. Article X, section 2(b)(4) (special requirements of surgical service in orthopedics) requires applicants for staff orthopedic surgical privileges to "demonstrate by training, experience, and performance the requirements for eligibility in [the specialty of orthopedics] as designated by the American Board of Orthopedics and be either Board Certified or Board Eligible." By–Laws of the Medical Staff of the South Georgia Medical Center. The osteopathic orthopedic residency training program that plaintiff completed at Memorial Hospital was not approved by the American Board of Orthopedics; therefore, he was not eligible to become certified by the American Board of Orthopedics and did not meet the requirements of SGMC's bylaw provision. In describing the reason for the denial of privileges to plaintiff, Charles F. Hobby, M.D., stated: "[A]n applicant must … be either Board Certified or Board eligible. [Plaintiff] did not complete an approved resi-

1. The final determination regarding extension or denial of staff privileges rests, in all cases, with the Authority itself. The various levels of committee review only generate "recommendations" for the Authority to act upon. By–Laws of the Medical Staff of South Georgia Medical Center, Article V, section 2. Furthermore, no adverse recommendation by any of the several peer review committees is final until ratified by the Authority, and the Authority will not consider a committee's recommendation until the affected practitioner "has exercised, or has been deemed to have waived, his/her right to an Appellate Review…." *Id.*; Article XIII, sections 1–7. The Board members who govern the Authority, and in whose hands rests *the ultimate decision* regarding privileges, are "appointed by the governing body of the county or municipal corporation of the area of operation…." O.C.G.A. § 31–7–72(a) (1991 & Supp.1994).

dency training program, therefore, he was not eligible to become certified by the American Board of Orthopedics. [Plaintiff] did not meet the requirements of the SGMC By-Laws and, accordingly, he was not accepted for membership on the medical staff." (Hobby affidavit, at ¶ 13).[2]

Plaintiff does have orthopedic staff privileges at nearby Smith Hospital in Hahira, Georgia, and plaintiff's former osteopathic, orthopedic surgical partner, Dr. Goss, was able to attain surgical staff privileges at SGMC because his residency, approved by the American Board of Orthopedics, made him board eligible.

### III.  CONCLUSIONS OF LAW

A.  Summary Judgment Based on an Immunity

This motion comes before the court in the context of a summary judgment motion. A grant of summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The substantive law identifies which facts are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are those that, when disputed, "might affect the outcome of the suit under the governing law. . . ." *Id.* A dispute concerning a material fact is "genuine" where "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.*

■ It is the movant who "bears the initial burden to show, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). When the movant has the burden of proof at trial, that party must carry its summary judgment burden by presenting evidence demonstrating that "on all the essential elements of its case . . ., no reasonable jury could find for the non-moving party." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991) (en banc). If, and only if, the movant carries the initial burden, then the burden shifts to the nonmovant to demonstrate that a material issue of fact exists precluding summary judgment. *Clark,* 929 F.2d at 608.

■ With these standards and procedures in mind, the court notes that defendants have the initial burden, as it would be incumbent upon them at trial to establish the existence of the various immunities asserted by them. The substantive laws that defendants claim entitle them to summary judgment establish "immunities." Under *Anderson,* this court must refer to the substantive law of the *Parker v. Brown* "state action" doctrine, the LGAA, and the HCQIA in determining which facts are material. Plaintiff, however, has concentrated the majority of his efforts on creating "genuine issues of material fact" in relation to the underlying causes of action.[3]

---

**2.** The American Board of Orthopaedic Surgery has established minimum educational goals that, if complied with, will allow a physician to be Board Certified in the field of orthopedics. Although the Board does not intend to "define requirements for membership in any organization or on the staff of any hospital," a hospital wishing to use the Board's criteria as its own may certainly do so. *See Silverstein v. Gwinnett Hosp. Authority,* 861 F.2d 1560 (11th Cir.1988) (determining propriety, under equal protection analysis, of conditioning the grant of orthopedic surgical staff privileges on "Board Certification" requirement). Indeed, SGMC requires that applicants for orthopedic surgical staff privileges be either "Board Certified or Board Eligible." In imposing this requirement, SGMC adopted as well the Board requirement that an applicant participate in an "orthopaedic surgery residency program" accredited by the Accreditation Council for Graduate Medical Education ("ACGME").

The Board's minimum educational requirements for post-graduate specialty training programs provide a yardstick by which to measure a physician's competence.

Plaintiff was aware of Board Certification, yet chose not to apply to an accredited orthopedic residency program that would have qualified him for it. Rather, plaintiff chose an osteopathic residency, one not accredited by the ACGME. Plaintiff is therefore currently ineligible for Board Certification.

**3.** For example, plaintiff maintains that defendants' proffered reason for denial of privileges—his inability to satisfy the standards of the American Board of Orthopedics—is false because such a board does not exist. If true, this would establish a genuine issue of fact material to plaintiff's underlying cause of action (antitrust violations).

However, since defendants' summary judgment motion is predicated upon one of several

This endeavor is in vain; when addressing the legal question of whether an immunity exists, it is unnecessary for the court to ever reach the merits of the underlying cause of action.

■ The Supreme Court, in *Mitchell v. Forsyth*, 472 U.S. 511, 527–28, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985), demonstrated that "a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." In determining whether the denial of *Harlow*-type qualified immunity to a defendant satisfied the "collateral order" doctrine, the Court stated:

> An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the [prerequisites to the extension of immunity exist]. To be sure, the resolution of these legal issues will entail consideration of the factual allegations that make up the plaintiff's claim for relief. . . .

*Mitchell*, 472 U.S. at 528, 105 S.Ct. at 2816 (footnote omitted). As an example of the factual inquiry necessitated by a claim of immunity, the Court described the process by which courts determine a congressman's immunity under the Speech and Debate Clause. A court must necessarily refer to the facts to determine whether the challenged actions fall within the protective scope of the asserted immunity. *Id.*

Similarly in this case the court need only analyze the facts insofar as it is necessary to determine whether defendants' challenged conduct falls within the scope of the immunities claimed by them. Whether or not defendants engaged in anticompetitive conduct is entirely irrelevant—the question before the court is whether a genuine issue of material fact exists that would preclude the existence of one of the several immunities to which defendants claim they are entitled. Accordingly, the court will consider only those arguments which support or oppose a finding that genuine issues of material fact exist in regard to the several immunities professed by defendants.

## B. State Action Immunity Under *Parker v. Brown*

### 1. General Rules of Law

The formulation of the "state action" doctrine has varied since it was first announced in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Its evolution is due primarily to the changing nature of defendants in cases applying the immunity. Initially, it was the state (usually through a state department or agency) being sued as the bogeyman of competition. In cases such as these, where the state, its officers, or agents had engaged in anticompetitive conduct, the Court held in favor of immunity if the state was engaged in "activities directed by its legislature." *Parker*, 317 U.S. at 350–51, 63 S.Ct. at 313. The inquiry focused on whether the conduct was "an act of government by the State as sovereign." *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 409, 98 S.Ct. 1123, 1134–35, 55 L.Ed.2d 364 (1978) (citing *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)). The effects repugnant to the forces of competition must have stemmed from "the state['s] command," the objective must have been "the execution of a governmental policy," and the state's role

substantive bodies of law dealing with immunities, facts which are material under the substantive law governing plaintiff's causes of action are wholly irrelevant. A fact "material" to an antitrust cause of action may or may not be material to a claim of immunity under the state action exemption doctrine. *Cf. Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Plaintiff's affidavit containing the above-referenced assertion is stricken on account of its patent contradiction of statements made earlier by plaintiff, both in his letter to SGMC (dated December 19, 1986) and during his hearing before the Appellate Review Committee (transcript of Hearing on 7/14/87, at 47). Specifically, plaintiff avers in his affidavit of May 8, 1990 that the American Board of Orthopedics does not, and never has, existed. However, plaintiff's letter of December 19, 1986 to SGMC (attached as exhibit to transcript of Appellate Review Hearing), refers explicitly to the "American Academy of Orthopedics Certification Boards."

must have been essential. *City of Lafayette,* 435 U.S. at 409, 98 S.Ct. at 1134–35.

The rule was later restated in the context of a municipal defendant, a political subdivision of the state rather than the state itself: "[T]he Parker doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. Because of the high probability that a municipality would impose anticompetitive restraints to favor its own interests rather than the state's, the Court in *City of Lafayette* created a two-pronged test for political subdivisions wishing to assert "state action" immunity. The Court felt that satisfying these two prongs would sufficiently establish a "state policy to displace competition with regulation or monopoly service" in the area over which the political subdivision had been given control. *Id.* First, the state must have "clearly articulated and affirmatively expressed as state policy" the anticompetitive restraint which was part of a comprehensive regulatory system. *Id.* at 410, 98 S.Ct. at 1135. Second, implementation of the "state's policy [must be] actively supervised." *Id.* at 415, 98 S.Ct. at 1138.

However, the "active supervision" requirement would later be eliminated from the test applied to political subdivisions, and only applied in cases involving purely private defendants. *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 46–47, 105 S.Ct. 1713, 1720–21, 85 L.Ed.2d 24 (1985). Thus "state action" immunity was available to political subdivisions merely upon a showing of a clearly articulated and affirmatively expressed state policy to displace competition with regulation. *Id.* The Eleventh Circuit Court of Appeals, in a case involving a publicly owned and operated hospital's board of directors, interpreted *Hallie* as requiring the defendant board to make the following showings: "(1) that it is a political subdivision of the state; (2) that, through statutes, the state generally authorizes the political subdivision to per-

form the challenged action; and (3) that, through statutes, the state has clearly articulated a state policy authorizing anticompetitive conduct." *F.T.C. v. Hospital Bd. of Directors of Lee County,* 38 F.3d 1184, 1187–88 (11th Cir.1994). That opinion goes on to explain the "clear articulation" test as requiring "that anticompetitive conduct is the *foreseeable* result of the legislation." *Lee County,* 38 F.3d at 1188 (emphasis supplied). Moreover, "foreseeable" is not the equivalent of "inevitable"—the test of foreseeability only requires "that the anticompetitive conduct be reasonably anticipated, rather than the inevitable, ordinary, or routine outcome of a statute." *Lee County,* 38 F.3d at 1190–91.[4]

The next step came when states began authorizing "private parties," as opposed to its political subdivisions, to engage in anticompetitive behavior. In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum,* 445 U.S. 97, 103, 100 S.Ct. 937, 942, 63 L.Ed.2d 233 (1980), the state had enabled wine producers to "prevent price competition by dictating the prices charged by wholesalers." The dangers present in *City of Lafayette*—individual municipalities acting in favor of their own interests over those of the state—were even more pervasive in *Midcal,* where the state was empowering "private" persons to act selfishly in restraint of trade. Because the dangers inherent in extension of the "state action" exemption to political subdivisions and private persons were the same (differing only by degree), the Court chose to apply to purely private actors the same test as originally used for political subdivisions. First, "the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy.'" *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943. And, second, "the policy must be 'actively supervised' by the State itself." *Id.* This second element has been interpreted to require that "the state exercise ultimate control over the challenged anticompetitive conduct." *Patrick v. Burget,* 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988). Whereas the second

4. This is consistent with what has been identified as a general liberalization of the immunity as it applies to municipalities. *See Wall v. City of Athens, Ga.,* 663 F.Supp. 747, 751–55 (M.D.Ga.

1987) (Fitzpatrick, J.) (concluding *Hallie* broadened state action exemption for municipal defendants).

prong had been eliminated in the case of municipal defendants, *Hallie,* 471 U.S. at 46, 105 S.Ct. at 1720, the "active supervision" element became a precondition of state action immunity for purely private actors.

■ To summarize, where a *political subdivision of the state* is engaged in conduct challenged as anticompetitive, it will be entitled to the "state action" exemption upon a showing that it is authorized to act in an anticompetitive fashion pursuant to a "clearly articulated and affirmatively expressed" state policy. *Hallie,* 471 U.S. at 46, 105 S.Ct. at 1720; *Bolt v. Halifax Hosp. Medical Center,* 980 F.2d 1381, 1385–87 (11th Cir.1993) (*Bolt IV*). In the Eleventh Circuit, this means that the anticompetitive behavior was a foreseeable, or reasonably anticipated, outgrowth of the statute empowering the defendant to act within a sphere of influence. *Lee County,* 38 F.3d at 1189.

■ Where the actor is a *private person,* the state action exemption is available if the state policy to replace competition with regulation is "clearly articulated and affirmatively expressed,"[5] and the state actively supervises the conduct in question. *Hallie,* 471 U.S. at 46, 105 S.Ct. at 1720. "Active supervision" requires that the state "exercise ultimate control over the challenged anticompetitive conduct." *Patrick,* 486 U.S. at 101, 108 S.Ct. at 1663.[6]

**2. Does the Municipality or Private Person Test Apply to the Authority, its Board Members, and its Committee Members?**

■ The next question is which of these two tests—political subdivision or private actor—will govern these defendants: the Authority, its Board Members, and the staff members who participated in the peer review activities. The Eleventh Circuit has found numerous authorities to be political subdivisions of the states that have created them. For example, in *Lee County* the defendant-Board was a political subdivision of the state simply because it was "a healthcare authority created by the Florida Legislature as a special purpose unit of local government." *Lee County,* 38 F.3d at 1188. And it is unlikely that any legal distinction exists for purposes of state action immunity between municipalities and other types of political subdivisions (such as authorities). *Askew v. DCH Regional Health Care Authority,* 995 F.2d 1033, 1037 (11th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 603, 126 L.Ed.2d 568 (1993) (cataloging various district court and appellate opinions finding state-created authorities to be municipalities for purpose of *Hallie* test). Like the hospital authority in *Sweeney v. Athens Regional Medical Center,* 705 F.Supp. 1556, 1565 (M.D.Ga.1989), the Au-

---

**5.** After *Midcal's* application of City of *Lafayette* to private parties, the Court confirmed the two-part test as being the same in both instances. *Hallie,* 471 U.S. at 39, 105 S.Ct. at 1717 ("[*Midcal*] applied the *Lafayette* two-pronged test to a case in which the state action exemption was claimed by a private party"). Therefore, in a case involving municipal and private defendants, both of whom engaged in the same challenged conduct, and both of whom operated under the same statutory authorization, satisfaction of the clear articulation element as to one would constitute satisfaction as to the other.

**6.** In *Bolt v. Halifax Hosp. Medical Center,* 851 F.2d 1273, 1279–84 (11th Cir.1988) (*Bolt I*), the Eleventh Circuit held that "active state supervision" existed where the courts of that state exhibited a willingness to conduct a sufficiently probing judicial review of staff privileges decisions. Specifically, courts in Florida "sufficiently probed" staff privilege decisions by ensuring procedures employed in peer review and credentialing were fair, assessing the validity of the criteria

used by hospitals, judging the sufficiency of evidence, and offering injunctive relief. *Bolt I,* 851 F.2d at 1283–84.

However, the Eleventh Circuit granted a request for rehearing en banc on the issue of "active state supervision" in light of the interpretation given that requirement by *Patrick v. Burget,* 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988) (state must "exercise ultimate control over the challenged anticompetitive conduct"). *Bolt v. Halifax Hosp. Medical Center,* 861 F.2d 1233 (11th Cir.1988). But because the appellee hospitals and their medical staffs withdrew claims of immunity under the state action exemption at oral argument, the en banc court never reached that question. *Bolt v. Halifax Hosp. Medical Center,* 874 F.2d 755, 756 (11th Cir.1989) (*Bolt II*). The decision in *Bolt I* was reinstated, except for that portion dealing with the state action exemption, which was vacated. *Id.* Thus courts in the Eleventh Circuit are left with little guidance on the "active supervision" inquiry in the context of peer review decisions by a municipal hospital and its medical staff.

thority here "is clearly a municipality for purposes of state action exemption."[7] *See also Bolt v. Halifax Hosp. Medical Center,* 980 F.2d 1381, 1385–87 (11th Cir.1993) (*Bolt IV*) (state-created hospital authority in Florida held to be a political subdivision entitled to immunity if it meets *Hallie* test). Accordingly, the Authority and its Board Members are entitled to application of the single-element *Hallie* test.

■ The question thus remains, "which test is to be applied to the staff members who served on the Authority's various peer review committees?" The Fourth Circuit Court of Appeals has held that medical staff members of a municipally owned and operated hospital, when "making their recommendation to deny privileges," act as agents of that hospital for purposes of the state action exemption doctrine; therefore, the immunity of such medical staff members, like the municipal hospital with which they are affiliated, is evaluated under *Hallie. Cohn v. Bond,* 953 F.2d 154, 158 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3057, 112 L.Ed.2d 922 (1992).

In *Cohn,* plaintiff-chiropractor appealed the district court's determination that staff members of a municipally owned and operated hospital, who recommended denial of privileges to him, were immune under the *Hallie* test for state action immunity. The Fourth Circuit recognized that whether the staff members would be required to satisfy the dual element *Midcal* formulation depended upon whether the staff members were employees or private parties. In this regard, the court found:

[W]hen members of the medical staff recommend action on an application for privileges, as authorized by the municipal hospital, they are acting in their capacity as employees, as opposed to private parties. Physicians who make peer review decisions at the behest of, or by delegation from, the hospital's board of trustees, are acting as agents of the hospital and are, therefore, indistinguishable from the hospital.

*Cohn,* 953 F.2d at 157–58. Because the hospital's conduct was immunized under *Hallie,* the staff members enjoyed state action immunity as well.

It is important, however, to address seemingly contradictory authority. In discussing whether allegations that a hospital and its medical staff had "conspired" together stated a claim under section 1 of the Sherman Act, 15 U.S.C.A. § 1, the Eleventh Circuit found that "[a] hospital and the members of its medical staff ... are legally separate entities...." *Bolt v. Halifax Hosp. Medical Center,* 891 F.2d 810, 819 (11th Cir.1990) (*Bolt III*), *vacated and remanded,* 980 F.2d 1381, 1387 (11th Cir.1993) (*Bolt IV*). However, as that case's subsequent history indicates, this finding has no precedential value. *See infra* note 9.

Even if *Bolt IV* did not vacate that portion of *Bolt III* holding that "a hospital and the members of its medical staff ... are all legally separate entities," the analysis in *Cohn* is not weakened by it. *Cohn* found that in the context of peer review activities, the medical staff defendants had acted as agents of the municipal hospital. *Bolt III* only held that a hospital and its medical staff were "legally capable of" conspiracy because of the legal distinction which existed between the two, not that they did in fact conspire in all instances. Thus, *Bolt III*'s holding did not foreclose the possibility that in some

---

7. The statute in which defendant-Authority has its genesis is O.C.G.A. § 31–7–72(a) (1991 & Supp.1994), which states:

There is created in and for each county and municipal corporation of the state a public body corporate and politic to be known as the "hospital authority" of such county or city, which shall consist of a board of not less than five nor more than nine members to be appointed by the governing body of the county or municipal corporation of the area of operation for staggered terms as specified by resolution of the governing body. * * * No authority

created under this Code section shall transact any business or exercise any powers under this Code section until the governing body of the area of operation shall, by proper resolution, declare that there is need for an authority to function in such county or municipal corporation.

Taken in conjunction with O.C.G.A. § 31–7–75 (1991) (listing powers and functions of hospital authorities), this statute convinces the court that hospital authorities in Georgia are entitled to treatment as political subdivisions for purposes of federal antitrust laws.

cases staff members might serve as agents of the hospital which they served.

In this case, the court finds that the individual staff members acted as agents of the authority at all times. This is not to say that in all cases staff physicians will be agents of the hospitals where they conduct peer review. Both *Cohn* and *Bolt III* allow for instances when the staff members are agents of their hospital authority and for instances when they are not. The court finds that this particular case provides one of the instances where staff members are agents of the authority at whose behest they conduct peer review activities.

Accordingly, the staff members' immunity under the state action exemption is to be analyzed under *Hallie*, along with the Authority and its Board Members.

### 3. Is it Georgia's Policy to Displace Competition with Regulation?

■ The Eleventh Circuit has issued at least three relevant decisions dealing with antitrust challenges to a public hospital authority's actions. The question common to each was whether a state's statutory scheme "reasonably anticipated" a particular kind of conduct which, when engaged in by a political subdivision, had anticompetitive results. The specific question for consideration here is whether Georgia's Hospital Authorities Law, along with other ancillary statutes, "reasonably anticipated" that local hospital authorities would act, based on the recommendations of their peer review committees, in an anticompetitive fashion when granting or denying surgical staff privileges.

In *Bolt v. Halifax Hosp. Medical Center*, 891 F.2d 810 (11th Cir.1990) (*Bolt III*), *rev'd on other grounds*, 980 F.2d 1381, 1387 (11th Cir.1993), the Eleventh Circuit was called upon to determine whether a special taxing district of the State of Florida, charged with the responsibility for operating a local hospital,[8] was entitled to immunity as a municipali-

ty under the "state action" exemption. The challenged action was the denial of staff privileges to the plaintiff-physician.

Once the court of appeals concluded that the defendant-hospital was entitled to application of the single-element, municipality test announced in *Hallie*, the court proceeded to conduct an analysis of Florida's legislative grant of power to the hospital. The examination's purpose was to determine whether the challenged action was taken "pursuant to a clearly expressed state policy" to act anticompetitively. *Bolt III*, 891 F.2d at 825. The "foreseeability of anticompetitive conduct" was the gauge by which to measure the clarity of the Florida legislature's "expression." Because the anticompetitive conduct was "authorized peer review in licensed medical facilities," the court referred to FLA.STAT. § 395.011(6), (7) (1987) (current version at FLA.STAT. § 395.0191 (1993)):

(5) The governing board of each licensed facility shall set standards and procedures to be applied by the licensed facility and its medical staff in considering and acting upon applications for staff membership or clinical privileges. These standards and procedures shall be available for public inspection.

(6) Upon the written request of the applicant, any licensed facility that has denied staff membership or clinical privileges to any applicant specified in subsection (1) or subsection (2) shall, within 30 days of such request, provide the applicant with the reasons for such denial in writing. A denial of staff privileges to any applicant shall be submitted, in writing, to the applicant's respective licensing board.

The court found that this legislative grant made it foreseeable that the hospital "would rely on *recommendations made by a physician's peers* and refuse to deal with (i.e., boycott) that physician." *Bolt III*, 891 F.2d at 825 (emphasis supplied).[9] Accordingly,

---

8. The court treated the special taxing district and the hospital as a single entity for purposes of the "state action" exemption. *Bolt III*, 891 F.2d at 813 n. 1.

9. The court further held that Florida's enabling legislation did not foresee a "conspiracy" be-

tween the hospital and its peer review committee, so that the hospital was not shielded under *Hallie* to the extent that it had "conspired" to deny plaintiff privileges. *Bolt III*, 891 F.2d at 825. However, the Supreme Court's decision in *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d

"the Florida legislature clearly articulated a policy to displace competition, at least to the extent that [a hospital] decision not to hire a physician can be considered a boycott." *Id.*

The Eleventh Circuit has also examined other actions in which publicly owned and operated hospitals have engaged to determine if their anticompetitive nature was a foreseeable result of enabling legislation. In *Askew v. DCH Regional Health Care Auth.,* 995 F.2d 1033 (11th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 603, 126 L.Ed.2d 568 (1993), a state-created, public health care authority's bid to acquire a private health care facility was challenged as anticompetitive. After discounting plaintiff's argument that defendant-authority was not entitled to application of the *Hallie* test when acting "like a private party," the Eleventh Circuit proceeded to determine whether the Alabama legislature's grant of power, which enabled the defendant-authority to acquire health care facilities,[10] made it foreseeable that such acquisitions would have anticompetitive results. The court noted that the Alabama legislature had directed health care authorities to act to the fullest extent of their powers, " 'notwithstanding that as a consequence of such exercise of such powers[,] it engages in activities that may be deemed "anticompetitive" within the contemplation of the antitrust laws of the state or of the United States.' " *Askew,* 995 F.2d at 1040 (quoting ALA.CODE § 22–21–318(a)(31)) (alteration in original). This "explicit recognition of the potential anticompetitive results" exceeded *Hallie's* foreseeability requirement; therefore, the defendant-authority's proposed acquisition could not render it liable under federal antitrust laws.

Finally, the Eleventh Circuit was most recently called upon to re-examine, in the context of Florida law, the issue decided in *Askew:* whether it was foreseeable that a state-created hospital authority would act anticompetitively in acquiring other hospitals. *F.T.C. v. Hospital Bd. of Directors of Lee County,* 38 F.3d 1184, 1190 (11th Cir. 1994). Despite the fact that Florida's legislature had not made a pronouncement as explicit as that contained in ALA.CODE § 22–21–318(a)(31) (directive to act notwithstanding anticompetitive effects), the court still found the proposed acquisition entitled to immunity from antitrust liability.

Stressing that the explicit authorization found in *Askew* "went well beyond what was required in order to render those results foreseeable," the court found that foreseeability only required anticompetitive effects to be a "reasonably anticipated" result of the enabling legislation. *Lee County,* 38 F.3d at 1190, 1191. Anticompetitive outcomes need not be "the inevitable, or even the routine or ordinary result of the power" specifically granted an authority; therefore, "broad and expansive" grants of power " 'within a specified field and for a particular purpose' … 'may be fairly construed to contemplate that [an authority] might displace competition in [a specific product market].' " *Lee County,* 38 F.3d at 1190 (quoting *Central Florida Clinic for Rehabilitation, Inc. v. Citrus County Hospital Bd.,* 738 F.Supp. 459, 464 (M.D.Fla.), *aff'd without opinion,* 888 F.2d 1396 (11th Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990)).

This court in *Sweeney v. Athens Regional Medical Center,* 705 F.Supp. 1556, 1563 (M.D.Ga.1989), conducted a detailed analysis of Georgia's statutory scheme authorizing the

---

382 (1991), caused the Eleventh Circuit to rethink this position. Three years later, in *Bolt v. Halifax Hosp. Medical Center,* 980 F.2d 1381 (11th Cir.1993) *(Bolt IV),* the Eleventh Circuit reversed *Bolt III* insofar as it denied application of *Hallie* on account of underlying allegations of conspiracy between the hospital and its staff. Inquiring into whether a conspiracy existed is improper in construing the availability of state action immunity for a public hospital. *Bolt IV,* 980 F.2d at 1387–89. *Bolt III,* moreover, remains good law to the extent that it finds Florida's legislation as foreseeably authorizing anticompetitive conduct in the area of peer review.

10. A subsidiary dispute in *Askew,* not present in this case, was whether Alabama's Health Care Authorities Act of 1982, ALA.CODE § 22–21–310 *et seq.,* authorized the conduct in question. The court in *Askew* decided that the statute did permit the contemplated acquisition, and then continued to determine whether the anticompetitive effects of such an acquisition were foreseeable.

In this case, the parties do not dispute the power of the defendants to conduct peer review activities. Georgia's Hospital Authorities Law does contemplate and provide for such activities.

creation of hospital authorities and the concomitant ability to conduct peer review and credentialing activities. The conclusion there was that Georgia's legislature made it foreseeable that hospital authorities would act in an anticompetitive manner in conducting peer review activities. One of the statutes relied upon by *Sweeney* was O.C.G.A. § 31–7–7, a provision establishing standards and procedures for the refusal or revocation of staff privileges by a publicly owned and operated hospital:

> Whenever any ... doctor of osteopathic medicine ... shall make application for permission to treat patients in any hospital owned and operated by the state, any political subdivision thereof, or any municipality, the hospital shall act in a nondiscriminatory manner upon such application ... considering the applicant on the basis of the applicant's demonstrated training, experience, competence, and availability and reasonable objectives, including, but not limited to, the *appropriate utilization of hospital facilities* ....

(emphasis supplied). *Accord Bolt v. Halifax Hosp. Medical Center,* 980 F.2d 1381, 1395 (11th Cir.1993) (Clark, J., dissenting) (*Bolt IV* ); *Coastal Neuro–Psychiatric Associates, P.A. v. Onslow Memorial Hospital,* 795 F.2d 340 (4th Cir.1986) (determining foreseeability in context of North Carolina statute based on "appropriate utilization of hospital facilities"). It is at the very least foreseeable, and most certainly reasonably anticipated, that this language would enable a hospital authority to engage in anticompetitive conduct through its peer review activities. The Georgia legislature could have foreseen, or at least reasonably anticipated, that authorities would consider the number of market participants in determining the "appropriate utilization of hospital facilities."

Other statutes that support this conclusion also demonstrate that it was certainly foreseen that a hospital authority's staff members, when serving on a peer review or medical review committee, would potentially act anticompetitively in making recommendations to the authority. The Georgia legislature's intent is to "provide protection for those individuals who are members of peer review groups which evaluate the quality and efficiency of professional health care providers and to protect the confidentiality of their records." O.C.G.A. § 31–7–130 (1991). One specific protection shields "professional health care providers" from all criminal or civil liability, under any law, for their participation in "peer review activities." *Id.* § 31–7–132 (1991). Similar protections exist for members of "medical review committees." *Id.* §§ 31–7–140 to –143 (1991). Finally, it is the policy of the State of Georgia to confer antitrust immunity on local governing authorities "in the exercise of powers specifically granted to them by law...." *Id.* §§ 36–65–1 and –2 (1993). The Authority in this case qualifies as such an authority, *id.* §§ 31–7–70 to –96 (Hospital Authorities Law), and the committee members qualify as agents thereof. *Cohn,* 953 F.2d at 158.

■ Notwithstanding the foregoing, plaintiff argues that it cannot be the policy of Georgia to displace competition with regulation in this area. Article III, § 6, ¶ 5 of the Georgia Constitution of 1983 contains a prohibition against legislative authorization of contracts or agreements that defeat or lessen competition, or encourage monopolization. Plaintiff argues that this constitutional provision renders inoperative any such authorization that might be contained in the above-referenced statutes. Indeed, this prohibition does extend to governmental units receiving their power to monopolize from the state legislature, and has been used to strike down such laws. *Jackson & Coker, Inc. v. Hart,* 261 Ga. 371, 405 S.E.2d 253 (1991) (striking down O.C.G.A. § 13–8–2.1 as unconstitutional). This constitutional argument is the linchpin of plaintiff's brief in opposition. If the delegation of anticompetitive powers through the Hospital Authorities Law and ancillary statutes violates Georgia's state constitution, then it can hardly be said that it is the policy of Georgia to displace competition with regulation. The court thus proceeds to analyze Georgia policy in light of plaintiff's contention.

The question essentially is whether Georgia has begun to literally apply this constitutional prohibition or whether its application remains tempered by the "rule of reason,"

followed for many years by the Georgia courts. In matters concerning allegations of restraint of trade, Georgia has generally followed the "rule of reason." This court-created rule "protects those contracts which are reasonable in light of the interests of the parties and the interest of the public." *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1447 (11th Cir.1991). Application of this rule has narrowed an otherwise overbroad constitutional prohibition. *Id.*

Plaintiff, however, cites *Jackson & Coker, Inc. v. Hart*, 261 Ga. 371, 405 S.E.2d 253 (1991), for the proposition that Georgia no longer follows the "rule of reason," but instead literally applies the constitutional prohibition in Art. III, § 6, ¶ 5. At issue in that case was a statute calling for the enforcement of "every contract in partial restraint of trade that is not against the policy of the law or otherwise unlawful." O.C.G.A. § 13–8–2.1(g)(1) (Supp.1994). However, the "rule of reason" was not the standard by which courts were to determine the "policy of the law." Rather, the statutory standard mandated the enforcement of contracts "not so much against that 'policy of the law' as to be 'unconscionable.'" *Jackson & Coker*, 405 S.E.2d at 255 (emphasis supplied). The possibility thus existed for courts to uphold contracts even though they were "against the policy of the law," thereby "breath[ing] life into contracts otherwise plainly void." [11]

The Georgia Supreme Court could not have meant to abandon the "rule of reason" through its opinion in *Jackson & Coker, Inc.*, especially since the majority did not mention the rule once. Moreover, the statute was plainly not a codification of the "rule of reason," and indeed went considerably beyond that rule in permitting contracts or agreements restrictive of trade. It seems unlikely that Georgia would implicitly overrule a doctrine followed by its courts for decades. This seems especially so when the rule itself was not even before the court. Doctrines such as the "rule of reason" traditionally go out with a bang, not a whimper. In this court's considered judgment, the "rule of reason" still governs in Georgia.

█ Courts in Georgia realized long ago, in *State v. Central Ry. Co.*, 109 Ga. 716, 726, 35 S.E. 37 (1899), that certain restraints of trade could be beneficial, and were at times even necessary: "[I]t may even be beneficial to the public that a particular place should not be overstocked with persons engaged in the same business." That same observation holds true today.[12] And because the rules of construction in Georgia require a law to be construed as constitutionally valid if possible, *Lasseter v. Georgia Public Serv. Comm'n*, 253 Ga. 227, 319 S.E.2d 824, 828 (1984), the court holds that the delegation by the state legislature, either explicitly or implicitly, of the power to engage in peer review activities that are restrictive of trade satisfies the "rule of reason" in these circumstances. The delegation is therefore valid under the Georgia Constitution.

The Authority, its Board Members, and the staff members serving on its various committees are absolutely immune from suit under the state action exemption of *Hallie*. The court—in light of the decisions in *Bolt III, Askew, Lee County*, and *Sweeney*, and the statutory scheme adopted by Georgia—finds that the State of Georgia has clearly and affirmatively articulated a policy to displace competition with regulation in regard to peer review activities conducted by publicly owned hospitals. Furthermore, the staff

---

**11.** The question arises: which contracts were those that were "otherwise plainly void"? The reference can only be to those contracts found void under the "rule of reason." Although a contract be unreasonable, and thus void under the "rule of reason," it might nevertheless satisfy the standard of conscionability, and thus be enforced under the statute. What the Georgia Supreme Court is apparently taking issue with is the lowered standard of enforceability for contracts restrictive of trade. *See Jackson & Coker, Inc.*, 405 S.E.2d at 255 (Clarke, C.J., dissenting).

**12.** It would seem that the balance struck at hospitals by granting and denying privileges is similar to the agreement among tenants at a shopping center to maintain a certain tenant mix. If those tenants have one shoe store among them, they may forbid the lease of additional space to other shoe merchants. This is because it is necessary for the survival of the shopping center as a whole to be able to maintain a diversified mix, with no trade or specialty represented by more merchants than there are clients to serve. Faced with a unique situation, maintaining the proper tenant mix is a "reasonable response."

members acted "as agents of [the Authority] in making their recommendation to deny privileges." *Cohn*, 953 F.2d at 158.[13] Therefore, summary judgment is **GRANTED** as to all defendants.

## C. Immunity Under the Local Government Antitrust Act

Even if *Hallie* did not provide defendants with an absolute immunity from suit, they would have been shielded from money damages by the LGAA, an act designed for lawsuits such as plaintiff's. Under the LGAA, a defendant must first be either a "local government" or a "person" as those terms are defined at 15 U.S.C.A. §§ 34(1), (2) (Supp.1994). Second, the defendant, either a "person" or "local government," must be sued on the basis of action taken in "an official capacity."

The staff members serving on the Authority's various committees are "persons." The Authority and its Board Members fall within the scope of the term "local government" as a "special function governmental unit established by state law." 15 U.S.C.A. § 34(1)(B) (Supp.1994). *See supra* note 7; *see also Sweeney*, 705 F.Supp. at 1561–62 (application of LGAA to hospital authorities in Georgia). Having established that the defendants are covered by the LGAA, all the court need determine is that the defendants were acting within the scope of their defined duties. As the undisputed facts make clear, all defendants acted within the scope of their duties, and as such are immune from "damages, interest on damages, costs, or attorney's fees...." 15 U.S.C.A. §§ 35(a), 36(a) (Supp. 1994). Defendants' motion for summary judgment on the basis of the LGAA is likewise **GRANTED,** so that even if defendants had not been immunized under the state action exemption, plaintiff would have been foreclosed from seeking monetary damages.

## D. Immunity Under the Health Care Quality Improvement Act

Defendants raise as their final federally generated immunity the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C.A. §§ 11101–11152 (Supp.1994). Under the HCQIA, most persons affiliated with a "professional review action"—the professional review body, any staff or members of the review body, any person under contract with the body, and any person participating or assisting the body with respect to the review action—are immunized from liability for damages under most federal and state[14] laws, including antitrust laws. *Id.* § 11111(a)(1); *Bryan v. James E. Holmes Medical Center*, 33 F.3d 1318, 1322 n. 4 (11th Cir.1994). The existence of HCQIA immunity, like qualified immunity under 42 U.S.C. § 1983, is properly determined at the summary judgment stage. *Bryan*, 33 F.3d at 1332–33 & n. 26. However, if there is a factual question on which the existence of the immunity is dependent, then an award of summary judgment on the basis of HCQIA immunity must be postponed until, or after, trial. *Id.* at 1333. The "subsidiary factual questions" controlling the existence *vel non*

---

**13.** Even if *Midcal's* dual element test was applied to the staff members as "private actors," the result would be the same in this case—the staff members' recommendations were ultimately subject to ratification by the Board, a group appointed by the local governing body. *Patrick*, 486 U.S. at 101, 108 S.Ct. at 1663. Because it is the appointees of the local governing body who "exercise ultimate control over the challenged anticompetitive conduct," the State of Georgia provides "active supervision" as required under *Midcal* and *Patrick*. *See also supra* notes 1 and 5.

The ineradicable distinction between *Patrick* and this case is the nature of the hospital involved. In the former, the hospital was apparently a private one, whereas in the latter the hospital is a political subdivision of the state that created it. The Fourth Circuit also seems to have distinguished *Patrick's* holding on this basis. *See Cohn*, 953 F.2d at 158 (citing *Patrick*).

**14.** Section 11111(c)(1) provides that, in regard to state-based causes of action, states may opt-in prior to the October 14, 1989, effective date. The effective date pertains to the date on which a complaint was "filed", not the date(s) on which a cause of action arose. Plaintiff claims that this effective date means no immunity exists for federal causes of action accruing prior to that date. That is an incorrect assertion.

This section simply allows States to render HCQIA immunity retroactive for causes of action based upon their laws. Defendants protected by the HCQIA are immune from liability for damages based on federal causes of action accruing on or after the act's effective date.

of the immunity should be submitted to the jury by means of special interrogatories; but in no case should the jury be asked to decide the ultimate question of defendants' immunity from damages under HCQIA. *Id.*

■ If a "professional review action" occurs, then those participating in it are immunized from damages. 42 U.S.C.A. § 11111(a)(1) (Supp.1994). A "professional review action" is defined as:

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such terms includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. In this chapter, an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on—(A) the physician's association, or lack of association, with a professional society or association, (B) the physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business, (C) the physician's participation in prepaid group health plans, salaried employment, or any other manner of delivering health services whether on a fee-for-service or other basis, (D) a physician's association with, supervision of, delegation of authority to, support for, training of, or participation in a private group practice with, a member or members of a particular class of health care practitioner or

professional, or (E) any other matter that does not relate to the competence or professional conduct of a physician.

*Id.* § 11151(9). If a challenged action falls within this definition, it still must satisfy four preconditions listed in § 11112(a) before it will receive protection under § 11111(a)(1). The four conditions listed in § 11112(a)(1–4) are as follows: (1) the action was taken in the reasonable belief that it furthered quality health care; (2) the action was taken after a reasonable effort to obtain the facts of the matter; (3) adequate notice and hearing are provided to the physician; and (4) the action was warranted by the facts.

■ Furthermore, § 11112(a) initially creates a rebuttable presumption, in favor of the party claiming the immunity, that these four prerequisites have been met: "A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence." *Id.* § 11112(a); *Bryan,* 33 F.3d at 1323. Thus the party challenging the review action bears the burden to show, by a preponderance of the evidence, that at least one of the four conditions listed in § 11112(a)(1–4) has not been met. If the aggrieved party does not satisfy this burden, then a review action worthy of HCQIA protection will be deemed to have occurred.

Defendants' recommendation to deny (or ultimate denial of in the case of defendant-Authority) orthopedic surgical staff privileges to this osteopathic doctor occurred during the course of a "professional review action." The grounds for denial were plaintiff's failure, or simple inability, to become Board Certified, a common requirement imposed upon physicians to insure that uniform standards of training, experience, and performance have been met.[15] As indicated in the

---

15. As an aside, the court notes that "Board Certified" or "Board Eligible" requirements are a rational basis, under a constitutional equal protection analysis, on which to condition the grant of staff privileges:

The recognized distinctions between osteopathic and allopathic postgraduate specialty training provide a rational basis for [a hospital

authority] to decide to restrict its Medical Staff to licensed physicians, who have completed [Accreditation Council for Graduate Medical Education]-accredited postgraduate programs and are certified by an American Specialty Board, for the legitimate purpose of assuring and standardizing quality health care.

undisputed facts, the Bylaws of SGMC contain a provision that requires applicants for staff orthopedic surgical privileges to "demonstrate by training, experience, and performance the requirements for eligibility in [the specialty of orthopedics] as designated by the American Board of Orthopedics and be either Board Certified or Board Eligible." [16] Because Board Certification is an explicit requirement, the Bylaws require the various review committees to consider, when making a recommendation concerning privileges, the type of residency program in which an applicant has participated.[17] And it was the professional judgment of the various review committees that, in light of SGMC's Bylaw provision, participation in an osteopathic residency was not the equivalent of an ACGME-accredited residency program. Defendants concluded that plaintiff's nonparticipation in an ACGME–approved residency program spoke directly to his level of competence in the specialty in which he sought privileges (orthopedic surgery). Accordingly, the decision to recommend denial of surgical privileges, and the ultimate denial by the Authority, were "professional review actions" presumptively entitled to HCQIA immunity.

Because the court finds that a "professional review actions" occurred, a presumption is created in defendants' favor that HCQIA immunity exists. It is now incumbent upon plaintiff to adduce evidence sufficient (a preponderance) to rebut this. Plaintiff has not met this burden. The only contentions raised by plaintiff that might be construed as rebutting this presumption deal with the fact that direct economic competitors were involved in the review process, and that during the Ad Hoc committee hearing on May 7, 1987, plaintiff was not allowed to have counsel present. *See* 42 U.S.C.A. § 11112(a)(3) (adequate notice and hearing). However, plaintiff was afforded counsel at the Appellate Review hearing held on July 14, 1987. Plaintiff's only evidence supporting the absence of adequate notice and hearing, therefore, is the fact that direct economic competitors were involved in the review process. This one shred of evidence is wholly insufficient to demonstrate that the hearings and notice provided plaintiff were unfair. *See Bryan*, 33 F.3d at 1336.

But plaintiff argues that §§ 11112(b)(3)(A)(ii) and 11112(b)(3)(C)(i) mandate a finding that adequate notice and hearing did not occur. Those sections are part of a larger laundry list of requirements that, if satisfied, establish a "safe harbor" for defendants seeking to provide adequate notice and hearing. There is no need for a court to reach this list of "suggestions" where a plaintiff fails to overcome the initial presumption established by § 11112(a).

Nevertheless, plaintiff here has misinterpreted the "suggestions" contained in § 11112(b) as the *sine qua non* for satisfaction of § 11112(a)(3). As both the statute and the court in *Bryan* make clear, however, "[a] professional review body's failure to meet the conditions described in [§ 11112(b) ] shall not, in itself, constitute failure to meet the standards of [§ 11112(a)(3) ]." Indeed, "[i]f other procedures are followed, but are not precisely of the character spelled out in [section 11112(b) ], the test of 'adequacy' may still be met under other prevailing law." *Bryan*, 33 F.3d at 1336 (citation omitted). The only effect of the allegations made through plaintiff's argument—that hearing officers were in direct competition with him and that he was prevented from having counsel at a hearing—would have been to preclude defendants' reliance upon § 11112(b) as a means for creating a presumption of compliance with § 11112(a)(3). Because plaintiff has not

*Silverstein v. Gwinnett Hosp. Authority*, 861 F.2d 1560, 1565 (11th Cir.1988) (denial of staff privileges to osteopathic physicians). One defendant in *Silverstein* was an osteopathic orthopedic surgeon. *See also supra* note 2.

**16.** Plaintiff has disputed the ability to be "Board Eligible" as that term is used in the Authority's Bylaws. Such a status, although not explicitly recognized by the American Board of Orthopedics, was obviously meant to be a shorthand way of describing the requisite credentials for applicants who, not having practiced long enough to be "certified," would sit for the Board's certification exams once they had been in practice long enough.

**17.** As mentioned above, Board Certification entails participation in an ACGME–accredited residency training program. *Supra* note 2.

succeeded in overcoming the statutory presumption of immunity, defendants are shielded from damages liability under HCQIA.

Although the issue of HCQIA immunity has been disposed of for purposes of this motion, the court feels compelled to address the additional, erroneous HCQIA arguments advanced by plaintiff. Plaintiff contends that § 11111(c) provides an effective date after the events occurred in this case and that the immunity extends only to "reporting" of information. The first argument, concerning effective dates, has been addressed above. *See supra* note 14. The other argument is indefensible. *See Bryan*, 33 F.3d at 1334 (revocation of staff privileges qualifies as professional review action, and thus within purview of statute).

Defendants' motion for summary judgment on the basis of the HCQIA is **GRANTED.**

### E. State Antitrust Claims

 Because the court has determined that defendants are immune from all federal claims, via the state action exemption, the only claims before the court are based on state antitrust laws. Under 28 U.S.C. § 1367(c)(3), this court declines to continue the exercise of supplemental jurisdiction over these state-based claims. *Capital Imaging v. Mohawk Valley Medical*, 791 F.Supp. 956, 968 (N.D.N.Y.1992), *aff'd*, 996 F.2d 537 (2d Cir.1993). Plaintiff's state-based claims are, accordingly, **DISMISSED.**

### IV. CONCLUSION

Defendants are absolutely immune from antitrust liability due to the state action exemption. Alternatively, defendants are immune from antitrust liability for money damages by reason of either the LGAA or the HCQIA. Their motion for summary judgment is therefore **GRANTED.** All pendent state-based claims are **DISMISSED.**

**SO ORDERED.**