JAMES EMORY, INC., Plaintiff,

v.

TWIGGS COUNTY, GA.,
et al., Defendants.

Civ. A. No. 94–273–3–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

May 10, 1995.

John Wayne Crowley, Michelle Lee Schieber, Macon, GA, for James Emory, Inc.

Mitchel P. House, Jr., Brian J. Passante, Macon, GA, for Twiggs County, GA, Twiggs County Bd. of Com'rs, William E. Hamrick, III, M. Opal Chance, Bobby Stripling, Tommie L. Bryant, and William Bond.

Theodore Freeman, Atlanta, Mitchel P. House, Jr., Macon, GA, Joseph Alexander Boone, Irwinton, GA, Philip W. Savrin, Atlanta, GA, for Wilkinson, GA, Wilkinson County Bd. of Com'rs, Jim Howell, William Frank Bloodworth, Kenneth L. Turner, John Williams, and W.E. Williams.

### *ORDER*

OWENS, District Judge.

Before the court is the Twiggs County defendants' motion for summary judgment. Defendants' motion was initially couched in the form of a dismissal pursuant to Federal Rule of Civil Procedure ("FED.R.CIV.P.") 12(b). Alternatively, defendants sought a determination of the status of plaintiff's claims under FED.R.CIV.P. 56, allowing courts to award summary judgment. Because matters outside of the pleadings would necessarily be considered by the court in deciding these motions—plaintiff, for example, originally filed an affidavit of one of its corporate officers—the court elected to convert defendants' entire motion to one for summary judgment. *See* FED.R.CIV.P. 12(c).[1] The Wilkinson County defendants, who have also

---

1. By order dated March 3, 1995, the court provided counsel with notice of this election and 15 days in which to supplement the record with any additional materials. *See* FED.R.CIV.P. 12(c). Counsel have all taken advantage of this opportunity.

Although defendants filed numerous affidavits of persons having knowledge of the events that form the basis of this lawsuit, along with docu-mentary evidence in support of their position, plaintiff only filed two affidavits—one by its attorney with three attachments and another by a corporate principal. Plaintiffs subsequently filed aerial photographs to rebut contentions made by defendants. Plaintiff has not filed any documentary evidence (other than that attached to its complaint) such as copies of letters, etc., evidencing communications between it and defendants.

moved for dismissal or summary judgment, are handled under separate order. After careful consideration of the arguments of counsel, the relevant caselaw, and the record as a whole, the court issues the following order.

## I. INTRODUCTION

### A. Statement of Facts

Plaintiff James Emory, Inc., a land development corporation, bought a 273.65 acre tract of land located in Twiggs County on April 29, 1987. The tract consisted of four quadrants: parcel X (61.67 acres), parcel Y (57.36 acres), and Blocks A and B (respectively subdivided into 9 and 7 lots) (154.62 acres). Plaintiff originally contemplated the subdivision and resale of the subject property as a residential area. Donald Watson purchased an option as to Blocks A and B on November 2, 1988, in the name of an undisclosed principal. Watson exercised this option, again on behalf of the undisclosed principal, thus precipitating the eventual transfer of the land from plaintiff to the undisclosed principal, defendant Twiggs County, on April 27, 1989.

For some indeterminate time prior to April 1989, defendants had been studying and formulating for eventual adoption a comprehensive solid waste management plan in conjunction with Wilkinson County. Under Official Code of Georgia Annotated ("O.C.G.A.") § 12–8–31.1, each city and county in Georgia was required to have "develop[ed] or be[en] included in a comprehensive solid waste management plan not later than July 1, 1993." That section further contemplates joint plans, such that counties like Wilkinson and Twiggs could collaborate on a plan's formulation.

**2.** The County had begun the EPD approval process sometime before April 3, 1989, for on that date the Chairman of the Twiggs County Board of Commissioners received a letter from EPD Assistant Director Reheis denoting "the acceptability of the property for solid waste disposal[, but] not approval to begin operation of the disposal site."

**3.** A factual question exists as to whether the name Landfill Road was adopted by reason of

Shortly after the April 27 transfer, defendant began the process of developing Blocks A and B ("defendants' land") as a municipal solid waste landfill ("MSWL").[2] The county-maintained road providing access to and from the land, including plaintiff's remaining contiguous parcels X and Y ("plaintiff's land"), came to be popularly known as Landfill Road (Complaint, exh. L).[3] Because of its new neighbor, plaintiff reconsidered its original plans to develop parcels X and Y as a residential subdivision, and began to entertain the notion of developing a MSWL of its own.

Plaintiff then undertook the initial steps in the MSWL development process, including consultation with engineers and other landfill owners and operators. Plaintiff also directed its attorney, Charles M. Leverett, to contact defendant regarding the existence of any land use or zoning ordinances that would conflict with the development of plaintiff's land as a MSWL. By letters dated March 12, April 30, and June 3, 1991, Leverett requested a "zoning letter" from defendants containing that information. Defendants did not tender an immediate response.

Between April 30 and June 3, 1991 (plaintiff's second and third letters), defendants adopted on May 7, 1991 a local resolution as follows:

> Commissioner Bond moved that no property in the County be used for the development of a landfill of any kind unless we set up ourselves to entertain such. Floyd seconded. Unanimous vote. Motion carried.

Up to this time, defendants did not have a comprehensive land development ordinance ("CLDO") nor standards and procedures governing the exercise of zoning powers in relation to the unincorporated section of Twiggs County.[4]

County action or whether it unofficially came to be known in that way.

**4.** Plaintiff complains that defendants violated its constitutional rights by not providing notice prior to the adoption of the landfill ordinance. Although the court does not reach the question of whether notice was in fact due plaintiff, the court notes that "the state may cure a procedural deprivation by providing a procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation

Towards the end of 1991, defendants decided to have the Middle Georgia Regional Development Center ("RDC") "proceed with a Land Use Plan and an impact statement for Twiggs County." *See* Minutes of Twiggs County Board of Commissioners (Oct. 15, 1991). Ralph Nix, assistant executive director of the RDC, stated that the Twiggs/Wilkinson municipal solid waste plan "was developed in compliance with pertinent Georgia statutes and regulations[, and] was further approved by the Georgia Department of Community Affairs as being in compliance with pertinent statutes and regulations of the State of Georgia." *See* Nix Supp.Aff., at ¶¶ 4–5.

Another resolution affecting plaintiff's land was also adopted before the zoning letter was ultimately sent. On July 23, 1992, the Twiggs County Board of Commissioners elected to close that portion of Landfill Road

running through Blocks A and B. Plaintiff contends that the road closure left its property without a means of public access, notwithstanding representations to the contrary within the road closing ordinance.[5] Plaintiff further disputes the resolution's declaration that notice was provided it as one of two landowners adjacent to Landfill Road and therefore affected by its closure, claiming that notice was not received by it until August 28, 1992. *See* Complaint (exh. L).[6] After the resolution effecting the road's closure was passed, plaintiff did not lodge any complaint, comment, or request for reconsideration with the Twiggs County Board of Commissioners until March 29, 1994, well over one year after the decision to close the road, when "attorneys for Plaintiff wrote [Robin McGuffin] asserting that James Emory, Inc. d/b/a Oco Resources was making a claim against Twiggs County because of the road

does a constitutional violation actionable under section 1983 arise." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir.1994). As will be seen, defendants cured any procedural deficiencies by eventually issuing a letter attesting to the compliance of plaintiff's land with local zoning and land use requirements. *See infra* note 8 and accompanying text. To the extent that Count V exists as a procedural due process claim, that count is due to be dismissed on account of the foregoing. *See also infra* note 6.

5. In studying County Map Number 63 (submitted by defendants), it appears that plaintiff's tract is not truly landlocked. What appears to be a much longer, remote means of access exists between Antioch Church Road and Parcels X and Y. However, plaintiff subsequently submitted aerial photographs depicting a much different scenario, in which actions taken by Dry Branch Kaolin Company have rendered this access unusable. The court cannot determine whether defendants knew of Dry Branch's plans when the road was closed, whether Dry Branch's actions occurred before or after the road closing, or whether Dry Branch was even responsible for blocking the more remote means of access to Antioch Church Road. However, these questions of fact are immaterial in light of the substantive law governing this summary judgment motion.

6. By letter dated August 28, 1992 (attached to plaintiff's Complaint as exhibit L), defendants informed plaintiff that:

in accordance with procedures of Georgia law, including but not limited to O.C.G.A. § 32–7–1 et seq., Twiggs County intends to close the

portion of Landfill Road *within the Twiggs/Wilkinson Landfill*, as shown on the attached map; once the resolution to do so is adopted, that portion of the Road will no longer be open for public transit.

(emphasis supplied). This letter clearly gives the impression that the resolution closing the road had not yet been adopted—yet the resolution doing just that was adopted over one month earlier, on July 23.

However, the legal question of whether notice was due plaintiff pretermits the factual one of whether notice was in fact received—was plaintiff an individual entitled to notice pursuant to O.C.G.A. § 32–7–4(b) (1991)? That code section provides that a county may declare a section of the county road system abandoned "after notice to property owners *located thereon*." (emphasis supplied). The statute specifically limits the notice requirement to landowners located on the particular section of road to be closed. In this case, Twiggs County is the only entity fitting that description since the only section of road abandoned was that which passed through its land. Even if notice was due plaintiff as an adjacent landowner "affected" by the closure, "[l]ack of proper notice is not a ground for granting a petitioner in mandamus the ultimate relief of ordering the road reopened." *Carnes v. Charlock Investments (USA), Inc.*, 258 Ga. 771, 373 S.E.2d 742, 744 (1988). *See* Complaint, Count II (seeking mandamus forcing defendants to reopen Landfill Road).

To the extent that Count V of the Complaint is predicated on the assumption that plaintiff was due notice, the court finds that count should be dismissed, as plaintiff was simply not due notice

closing." *See* McGuffin Aff., at ¶¶ 3–4.[7]

The zoning letter requested by plaintiff in March, April, and June of 1991 was eventually sent on September 9, 1992, *see* Complaint (exh. I),[8] and plainly stated that "the referenced property is not subject to a local zoning/land use plan or ordinance which was adopted by this local governmental body." However, the letter qualified itself by stating that it did not "in anyway ... grant or acknowledge the use of [plaintiff's] property as a solid waste handling facility without compliance with the Comprehensive Land Use Plan and Zoning Ordinance" to be. adopted by the County Commission.

With letter in hand, plaintiff was seemingly prepared to begin the arduous permitting process associated with construction of a MSWL. Indeed, shortly after receiving the letter, plaintiff filed its first application. On October 14, 1992, plaintiff tendered applications to the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources for a permit to construct a materials recovery and processing facility, a biomedical incinerator, a construction and demolition disposal site, a MSW incinerator, a composting site and facility, a commercial and industrial waste disposal facility, and a MSWL. EPD's initial response identified multiple deficiencies in plaintiff's applications,. none of which were caused by defendants' delay in issuing the zoning letter. *See*, *e.g.*. letter from Dunbar to Hardie (11/2/92); *infra* note 14. To remedy these, plaintiff's consulting engineers resubmitted the corrected applications on November 6, 1992.

But by December 8,. 1992, plaintiff was only seeking permission for a MSWL. Along with its letter informing EPD that it had abandoned all applications excepting that for the MSWL, plaintiff resubmitted its application and a previous geologic assessment report (dated February 1989) on the site. Consideration of plaintiff's MSWL application then came to a standstill on December 21, 1992, when EPD informed plaintiff that the assessment report as submitted was doubly insufficient. First, the report had been prepared for the Twiggs County Board of Commissioners, not plaintiff. Thus for plaintiff to use the report permission would have to be obtained from defendants. Second, the then-current assessment report requirements, different from those in place when the Twiggs submission was made, potentially rendered the study obsolete. Plaintiff has since discontinued its pursuit of EPD approval.[9]

As defendants indicated in the zoning letter issued to plaintiff, the county was plan-

---

prior to the road's closure. *See also supra* note 4.

**7.** This lawsuit was filed on July 14, 1994, approximately three and one-half months after plaintiff notified defendants that it was making a claim based upon the road closing. There is no evidence, from either side, that plaintiff made any further attempts to contact defendants in the interim, or that defendants tried to contact plaintiff in regard to the road's closure.

Although plaintiff's complaint states in paragraph 65 that it promptly notified defendants of its claims and suggested alternative means of resolving the matter, plaintiff has not offered any documentary evidence or affidavit testimony in support of this contention. *See supra* note 1. The court can not accept the bare allegations of the complaint as true, especially when plaintiff's position has been rebuffed by uncontradicted documentary evidence and affidavit testimony, plaintiff has been given the opportunity to file documents and affidavits in support of its position, and plaintiff has failed to do so. When plaintiff had evidence creating an issue of fact, it did not hesitate to file supplemental authority. *See* Goolsby Aff. (filed Apr. 19, 1995 as supplemental authority to demonstrate no access to

plaintiff's property exists, contrary to defendants' position).

**8.** This letter is apparently the foundation for a settlement between plaintiff and defendant that resulted in plaintiff's dismissal of the case without prejudice from Twiggs Superior Court.

**9.** The introduction to the geological assessment report reads as follows: "The Board of Commissioners of Twiggs County, Georgia are in the process of developing a municipal solid waste landfill (MSWLF) for the disposal of waste generated by Twiggs County residents." Because of the proximity of plaintiff's land to the Twiggs landfill, plaintiff apparently assumed that it could piggyback on defendants' geologic study. As the EPD letter of December 21, 1992, indicates, plaintiff could not do this. Plaintiff has not submitted any evidence demonstrating that it sought, or that defendant refused to give, permission to use the county's study in the course of its EPD application. *See supra* note 7. Furthermore, plaintiff has failed to produce any evidence linking the different "site assessment" requirements to heightened federal standards under Subtitle D. *See* letter from Dunbar to Hardie (12/21/92). *See infra* note 14.

ning to adopt standards and procedures for zoning and a CLDO for the unincorporated portion of the county. Twiggs County eventually adopted standards and procedures governing the exercise of zoning powers in the unincorporated section of the County on May 23, 1994. *See* Resolution 94–9. At this meeting, the Twiggs County Board of Commissioners also adopted the CLDO for the unincorporated area of the County. *See* Resolution 94–10. The CLDO, according to certified copies of documents introduced through affidavit testimony, was approved by the Georgia Department of Community Affairs prior to its adoption by defendants. *See* Nix Aff., at ¶ 7. Ralph Nix also testified by way of affidavit that, during the formulation of the CLDO, proper notice was given for required hearings and that those hearings were held. *See* Nix Aff., at ¶ 6 (referencing attached copies of notice given and minutes of meeting held). The consideration and adoption of both resolutions was preceded by notice published in the local paper on May 5, 1994. *See* Peek Aff. (copy of notice attached thereto). The minutes of the meeting do not indicate that plaintiff was present, or made any objection. Plaintiff has failed to object, seek a variance, propose an amendment, or otherwise take any affirmative steps to further the development of its land in accordance with the procedures provided for in the CLDO. *See* McGuffin Aff., at ¶ 5; *supra* note 7.

The CLDO, although defining "landfill" in Section 32(54), does not establish a zoning district that explicitly provides for the location of landfills. Of the eleven types of zoning districts [10] set up by the CLDO, not one lists a "landfill" as a permitted use therein. As such, Section 51 would cause "landfills" to be a prohibited use: "Any use not allowed as a permitted or conditional use within the applicable zoning district shall be deemed prohibited." But the CLDO's grandfather clause, found in Section 61, continues the legality of land uses in effect prior to the adoption of the CLDO. Indeed, Section 61 is apparently the provision that allows the continued operation of the Twiggs/Wilkinson landfill.

Section 61's operation upon existing uses later plays a significant role in determining whether a variance should be granted. The CLDO, in Section 114 and 115, provides a method by which an aggrieved landowner can pursue a "variance" in zoning regulations, thereby allowing him to put his property to a desired, albeit nonconforming, use. Section 114 allows a variance to issue upon a finding that the following factors exist: (1) a defect in the property, which existed prior to the adoption of the CLDO, prevents "the owner from enjoying the same rights granted by the zoning ordinance to all other property owners similarly zoned"; (2) the particular defect is not attributable to the landowner; (3) a variance permitting the requested use will not alter the character of the neighborhood or impair the use of adjacent tracts; (4) the variance is necessary for the reasonable use of the property; and (5) the variance is tailored as narrowly as possible. *See* CLDO, §§ 114.3.1–114.3.5. However, the next subsection, 114.5, seemingly nullifies the variance granting provision's effectiveness—"No variance or special exception shall be granted for use of land or building or structure that is prohibited by this ordinance or that is not permitted by this ordinance." When read quickly, and in isolation from the CLDO's other provisions, this language would preclude variances for the construction and operation of MSWL's.

However, by reason of the grandfather clause's operation, "landfills" became a use permitted by the CLDO. The application of the grandfather clause to Twiggs' prior, existing use prevents consideration of "landfill use" as one which is either "prohibited" or "not permitted" by the CLDO. In so preventing that consideration, Section 114.4's putative impediment disappears.

Even if the court's reading of the CLDO's variance provisions is incorrect, yet another avenue exists for plaintiff to pursue to enable the use of his property as a MSWL. Under

---

**10.** The eleven zoning types are: agriculture residential (R–AG), single-family residential (R–1), multi-family residential (R–2), manufactured home residential (R–MH), neighborhood service commercial (C–1), general commercial (C–2), general industrial (I–G), planned unit development (PUD), base environs overlay (BE), floodway (FW), and river protection overlay (RP).

Article XVI—Procedure for Requesting an Amendment to the Comprehensive Land Development Regulations, "[p]roposals for amendments to these regulations" may be initiated by "any persons, firm, or corporation." Amendment may be had as to either the text of the regulations themselves or the county's official zoning map.[11]

Even if the court's interpretation of the availability of a variance is incorrect, and even if efforts at amending the CLDO would ultimately be fruitless, the fact remains that plaintiff has pursued neither option. Plaintiff's continued complaint that it has been prevented from using its land is difficult to accept in light of defendant's issuance of the zoning letter. As has been seen, each renunciation by EPD was not based upon zoning noncompliance, but rather upon the insufficiency of plaintiff's own efforts.

Plaintiff would rather contend through the instant litigation that any such pursuits would be futile, and that defendants' actions are invalid. Plaintiff also contests defendants' claim that no land use plan existed for the unincorporated portion of Twiggs County prior to adoption of the CLDO. Plaintiff contends that the May 7, 1991 landfill resolution effectively established a moratorium on all private landfill development, and was the equivalent of a land use plan.[12] Plaintiff further contends that the landfill resolution effectively established a moratorium on all private landfill development, and that the landfill resolution has not been displaced by the CLDO, *i.e.*, the landfill resolution continues to operate against plaintiff's land. Specifically, plaintiff opposes defendants' interpretation that the CLDO either explicitly or implicitly repealed the May 7, 1991 resolution.[13]

However, plaintiff's understanding of the landfill resolution's effect was not based upon its interaction or communications with defendants. Rather, plaintiff's reading of the resolution is based upon pure conjecture. Plaintiff has not produced one shred of evidence demonstrating that its reading of the resolution is due to an interpretation provided by defendants. *See supra* note 7. And despite the claim that the landfill resolution lacked procedural safeguards, such an assertion is belied by the fact that plaintiff was eventually issued a zoning letter attesting to the compliance of plaintiff's land with local zoning and land use plans. Plaintiff has never attempted to obtain from defendants their interpretation of the landfill resolution's effect, or whether defendants would consider the construction of a private landfill.[14]

11. Since "landfill" is already defined by the CLDO, the amendment procedure would seemingly be simplified.

12. The court fails to understand how plaintiff can maintain that the landfill resolution was a "land use plan" when the zoning letter plainly states that plaintiff's property was not subject to a plan. The only period of which plaintiff can really complain is between the time when the zoning letter was requested and when it was finally issued. And as previously noted, no evidence exists that the development of plaintiff's land as a MSWL was prejudiced by that delay—plaintiff's own shortcomings are to blame for the failed EPD applications.

13. Fatal to plaintiff's position, however, is Section 183 of the CLDO, which specifically provides: "All Resolutions and Ordinances, or portions thereof, in conflict with this ordinance shall be and the same are hereby repealed." As was made clear *supra*, it is extremely possible that the landfill resolution was repealed by operation of the CLDO's grandfather clause. Until the local official or board charged with enforcement of the CLDO renders a decisive interpretation of the effect of the CLDO on the landfill resolution, this court cannot say with any certainty what the status of the landfill resolution—effective, repealed, partially repealed—might be.

14. In light of the fact that the zoning letter was eventually issued, and that the delay in issuance of the zoning letter appears not to have prejudiced the development of plaintiff's land in any way, the court is perplexed at what plaintiff complains of.

If the development of plaintiff's land was in any way compromised, it was due solely to plaintiff's own mistakes. As has been shown, any and all denials or rejections issued by EPD to plaintiff focused solely on the inadequacy of plaintiff's submission (*see, e.g.*, letter from Dunbar to Hardie, 11/2/92)—plaintiff has not identified or submitted a single communique between it and the EPD where the impediment to development of the land as a MSWL was noncompliance with local zoning or land use, or where a heightened federal standard under "Subtitle D" resulted in the application's failure. *See supra* note 7. Indeed, the zoning letter issued to plaintiff certifies the property's then-compliant status with local ordinances and land use plans. And plaintiff simply cannot point to any evidence now before

## B. Claims Asserted

Plaintiff's complaint alleges eleven different claims based upon the foregoing facts. Count I seeks a declaratory judgment pursuant to 28 U.S.C. § 2201. By that vehicle, plaintiff desires a declaration that, under these facts, it has a right to develop its property as a landfill, and that the continued application of the impediments raised by defendants be enjoined.

Count II describes the road closing resolution as arbitrary and capricious for purposes of the Fourteenth Amendment's Equal Protection Clause and the similar prohibition contained within the Georgia Constitution. The landfill resolution is likewise labeled unconstitutional, but by reason of its violation of the Fifth Amendment's Takings Clause and the Fourteenth Amendment's Due Process Clause. Plaintiff claims the application of the landfill resolution is an arbitrary and capricious due process violation. On the basis of the enumerated violations, plaintiff would have the court issue a mandamus forcing defendants to reopen Landfill Road.

Count III picks up on the alleged Fifth Amendment "takings" violation described in Count II. Plaintiff contends that result of defendants' actions are to deprive it of valuable property rights without just compensation therefor. Similar provisions of the Georgia Constitution containing corresponding "taking" prohibitions are also alleged as the source of a cause of action in this count.

Count IV realleges the takings violation in the context of the Fourteenth Amendment's Due Process Clause and the analogous state constitutional provision, claiming that depriving plaintiff of access to and an appropriate use of its property was arbitrary and capricious. Plaintiff also complains of not being afforded an opportunity to challenge the moratorium before the County Commission.

Count V states that the road closing resolution was arbitrary, capricious, and adopted without adherence to the constraints of due process, thereby violating the Fourteenth Amendment and the analogous state constitutional provision.

Count VI essentially is a more explicit statement of Counts II and III. It refines the "takings" portions of those counts by more particularly characterizing the landfill resolution as being devoid of objective standards that could be applied in determining whether an application for a landfill permit should be granted. The absence of such standards constitutes a taking, plaintiff claims, under the Fifth and Fourteenth Amendments (and similar state constitutional provisions).

Count VII revisits the Equal Protection Clause of the Fourteenth Amendment first raised in Count II. Plaintiff supports this equal protection challenge on the basis that defendants refused to deal fairly by differentiating between it and other similarly situated landowners in an arbitrary and capricious fashion.

Count VIII charges defendants with the commission of an intentional constitutional tort. Plaintiff also claims the nature of defendants' conduct entitles it to an award of attorney fees.

Count IX brings the constitutional violations previously alleged—Fifth and Fourteenth Amendment taking and due process claims—under 42 U.S.C. § 1983. An award of attorney fees is also sought under 42 U.S.C. § 1988.

Count X asserts that defendants' conduct was a restraint of trade in violation of 15 U.S.C. § 1 and that the same conduct amounted to a monopolization, or an attempt to monopolize, in contravention of 15 U.S.C. § 2.

Finally, Count XI alleges bad faith by defendants in preventing plaintiff from competing against their "commercial" interest.

To summarize, plaintiff asserts causes of action of two types: constitutional and statutory. The constitutional claims challenge defendants' actions as violative of the Fifth and Fourteenth Amendments to the U.S. Constitution in various ways. The statutory claims label defendants as monopolists, and also incorporate any proven constitutional violations by way of 42 U.S.C. § 1983. The remainder

the court that suggests or implies prejudice to the

development of a MSWL by reason of delay.

of plaintiff's claims are based upon similar state law prohibitions.

## II. DISCUSSION

The Twiggs defendants contend that the following grounds entitle them to summary judgment on some or all of plaintiff's claims: mootness, abstention, failure to exhaust state administrative remedies (ripeness), state action immunity (as to antitrust claims), failure to sufficiently plead a violation of equal protection prohibitions, the statute of limitations (as to § 1983 claims), failure to sufficiently plead a violation of substantive due process, and immunity from § 1983 liability by reason of either absolute or qualified immunity.

### A. Summary Judgment

A court should award summary judgment when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). As the Eleventh Circuit Court of Appeals recently stated:

> The court examines the substantive law involved to determine which facts are material. All reasonable doubts about facts are resolved in favor of the non-moving party.
>
> If the moving party bears the burden of proof at trial, it must demonstrate that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." "Once a moving party has sufficiently supported its motion for summary judgment, the non-moving party must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact"; it "must do more than simply show that there is some metaphysical doubt as to the material facts."

Irby v. Bittick, 44 F.3d 949, 953 (11th Cir. 1995) (citations omitted). With these standards and procedures in mind, the court proceeds to an analysis of the grounds that defendants claim entitle them to an entry of summary judgment.

### B. Mootness

■ Defendants contend that their official discontinuance of the allegedly offensive conduct has mooted plaintiff's claims. The court does not agree. The test for determining whether a claim has become moot "is a stringent one and the voluntary cessation of allegedly illegal conduct does not moot a case." National Advertising v. City of Fort Lauderdale, 934 F.2d 283, 286 (11th Cir.1991). The Eleventh Circuit, furthermore, has labeled the law as being "well-settled" in that

> a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. . . . . [T]he city's repeal of the objectionable language would not pre-clude it from reenacting precisely the same provision if the District Court's judgment were vacated.

National Advertising, 934 F.2d at 286 (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 1075, 71 L.Ed.2d 152 (1982)). The situation addressed by the Eleventh Circuit in National Advertising is indistinguishable from the case sub judice. Plaintiff's claims have not been mooted.[15] See also Dimmitt v. City of Clearwater, 985 F.2d 1565, 1571 n. 5 (11th Cir.1993); 13 A WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE, § 3533.7 (1984 & Supp.1994).

### C. Ripeness

Challenges to a municipality's refusal to accommodate a landowner's zoning or land use wishes may assume four forms: "just compensation, due process takings, arbitrary and capricious due process, and equal protection claims." Eide v. Sarasota County, 908 F.2d 716, 720 (11th Cir.1990), cert. denied, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). Counts Two through Seven, along with Counts Eight and Nine to the extent that they are predicated upon the success of the former, each fall within one or more of these four categories since each is based upon zoning or land use decisions made by defendants. The ripeness inquiry

---

15. The court also notes that the "heavy" burden of establishing mootness is borne by the defendants. See, e.g., County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

to be conducted by a court differs according to which of the foregoing claims is under consideration. *R.T.C. v. Town of Highland Beach*, 18 F.3d 1536, 1546 (11th Cir.1994); *Eide*, 908 F.2d at 722–23.

### 1. Fifth Amendment Just Compensation Claims—Counts III and IV

■ In regard to plaintiff's claims based upon failure to provide just compensation—Counts III and IV—defendants assert that such a claim is not ripe until plaintiff exhausts available state remedies. Specifically, defendants base this argument on *Williamson County Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), and its progeny, *e.g., East–Bibb Twiggs Neighborhood Assoc. v. Macon–Bibb County Planning & Zoning Comm'n*, 896 F.2d 1264 (11th Cir.1989).

The law in regard to the doctrine of ripeness in the context of a Fifth Amendment just compensation claim has been succinctly stated within this circuit:

> In order for a [Just Compensation Clause] claim to be ripe for adjudication, the landowner must overcome two hurdles: the final decision hurdle and the just compensation hurdle. The landowner must [1] obtain a final decision regarding the application of the zoning ordinance or regulation to his or her property and [2] utilize state procedures which provide for obtaining just compensation.

*Eide v. Sarasota County*, 908 F.2d 716, 720–21 (11th Cir.1990), *cert. denied*, 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). To prove that a "final decision" has been reached, the aggrieved landowner "must demonstrate that the decisionmaker 'charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" *Reahard v. Lee County*, 30 F.3d 1412, 1415 (11th Cir.1994) (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985)). And the latter requirement—that plaintiff exhaust available state remedies for obtaining compensation—"generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy." *Reahard*, 30 F.3d at 1417.

Defendants do not challenge the finality of the decision, and the court expresses no view on that issue in respect of plaintiff's just compensation claims. Rather, the thrust of defendants' challenge to plaintiff's uncompensated takings claim is that state procedures exist for plaintiff to pursue in seeking compensation. Until plaintiff has exhausted these procedures, defendant argue, plaintiff's claim is not ripe.

In *East–Bibb Twiggs Neighborhood Assoc. v. Macon Bibb Planning & Zoning Comm'n*, 896 F.2d 1264 (11th Cir.1989), the Eleventh Circuit Court of Appeals, affirming this court's decision, held that the failure by residents to seek compensation for an adverse zoning decision through state law procedures prior to instituting a federal action precluded consideration of the issue by the district court, *i.e.*, the takings claim was not yet ripe. Plaintiff challenges the continuing validity of this decision in light of subsequent pronouncements by the Georgia courts. Plaintiff cites *Alexander v. DeKalb County*, 264 Ga. 362, 444 S.E.2d 743, 745 (1994), wherein the Supreme Court of Georgia referred to its 1990 decision of *Fulton County v. Wallace*, 260 Ga. 358, 393 S.E.2d 241 (1990), as one which "rejected inverse condemnation as a remedy in a rezoning case and reversed the award of damages to the property owner."

■ Contrary to the proposition for which plaintiff cites these cases, Georgia does indeed recognize inverse condemnation as a remedy for a taking that results from an adverse zoning decision. *Wallace* held that when a governing authority has been ordered to rezone property because of the existing zoning scheme's unconstitutionality, the authority's failure to comply with the court's order may not be remedied under an inverse condemnation cause of action. There has been no order to rezone in this case, nor has there been a predicate finding of unconstitutionality on which an order to rezone might be based.

Furthermore, the court in *Wallace* quoted with approval the following statement of the

law as regards inverse condemnation as a remedy for a "taking" occasioned through the application of zoning laws:

> Under the eminent domain provision of the Georgia Constitution there may be no damage to the property of an individual for a public purpose without there first being compensation. In the context of regulation, including zoning, this has been construed to mean that actions of the governing authority which exceed the police power will rise to the level of condemnation and require compensation....

*Wallace,* 393 S.E.2d at 243 (quoting *Gradous v. Board of Comm'rs,* 256 Ga. 469, 349 S.E.2d 707 (1986)). Indeed, notwithstanding implications to the contrary in *Alexander's* interpretation of *Wallace,* the court in *Wallace* entirely avoided the question of "whether or not a board's failure to rezone property to a constitutional classification as interpreted by a trial court could ever amount to inverse condemnation under Georgia law." If anything, *Wallace* supports the conclusion that inverse condemnation is an available remedy for the application of adverse zoning regulations. *Wallace* simply listed the causes of action available to redress the failure of a governing authority to comply with a trial court's order to rezone.

Finally, the court notes that in *Alexander* the aggrieved party first obtained a finding that the zoning was unconstitutional. In relation to the takings claim, plaintiff does not assert that the zoning is unconstitutional, but merely that the taking effected by it has been uncompensated. Any allegation of unconstitutionality in this regard is due solely to the fact that the taking is uncompensated, not that it was effected pursuant to an invalid zoning regulation.

This court has previously relied on Supreme Court precedent "recogniz[ing] an inverse condemnation claim for money damages where a zoning regulation amounts to a taking." *East–Bibb Twiggs Neighborhood Association v. Macon Bibb Planning & Zoning,* 662 F.Supp. 1465, 1468 (M.D.Ga.1987) (citing *First Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)). In light of the foregoing, the court **GRANTS DEFENDANTS' SUMMARY JUDGMENT MOTION** as to all "just compensation" taking claims asserted by plaintiff. Defendants' evidence, coupled with a lack thereof from plaintiff, establish beyond a doubt that plaintiff has not sought compensation under state law for the road closing, the landfill resolution, or the CLDO.

2. Due Process Takings Claims—Counts II, III, IV, and VI

■ Whether conduct by the government has resulted in a "due process taking" depends upon the substantiality of the taking. Counts II, III, IV, and VI may be read as setting forth these types of claims. Where the taking only decreases the value of the property such that money damages can make the plaintiff whole again, a "just compensation" claim will lie. *Eide,* 908 F.2d at 721. However, where the effect of the government conduct is to effectively deprive the owner of all uses of the property, so that application of the zoning decision amounts to a taking by eminent domain, a "due process takings" claim has been stated. *Id.*

■ Similar to a claim for just compensation under the Fifth Amendment, a "due process takings" claim must satisfy the same "finality" requirement. *Id.* Unless a plaintiff demonstrates that the decision to implement the challenged conduct is final, "a court cannot determine whether a regulation has gone too far [since the court does not know] how far the regulation goes." *Id.* In other words, unless the official in charge of implementation has fully applied the regulation, the court cannot ascertain with any certainty the complete impact of the ordinance (whether its application exceeds constitutional limitations).

■ Plaintiff notified defendants on March 29, 1994 (three and one-half months prior to the filing of the instant litigation) that it intended to make a claim for the road's closure. This notice was given well over one year after the road's actual closure. Providing notice that a "claim" will be made does not force the hand of the official charged with the implementation of the challenged conduct, except insofar as the notice is seen

as an ultimatum—"do not go through with the planned closure or else!"[16] Allowing aggrieved landowners to obtain a "final" decision by issuing unilateral ultimatums is not a method envisioned by the law. Plaintiff must demonstrate some affirmative act by defendants after receipt of a demand other than a refusal to respond.[17] Once one side assumes a confrontational posture, the other is likely to mirror it. Plaintiff has not submitted any evidence demonstrating that it requested reconsideration of the road closing, or whether it sought a conciliatory middle ground in that regard. *See also supra* note 7.

■ Plaintiff further claims defendants reached another final decision—that no private landfills could be developed. This is incorrect, under either the landfill resolution or the CLDO. Plaintiff cannot maintain this position in light of its failure to pursue a final interpretation (of either ordinance) from the local official or board charged with enforcement. Moreover, defendants did reach a final decision regarding the landfill resolution—plaintiff's land was not subject to its constraints. The zoning letter issued by defendants in 1992 clearly exempts plaintiff's land from the landfill resolution's operation. Plaintiff's claim that defendants' "final" decision under the landfill resolution was to deny it permission to construct a private landfill is simply untenable in light of the zoning letter.

Additionally, plaintiff has sought neither a variance nor made any attempt at pursuing an amendment to the CLDO. Rather, plaintiff is content to rest on its allegation that since no private landfills are permitted by the CLDO, resort to the variance process is futile. The court cannot agree. In the court's considered judgment, the CLDO's variance provisions create a realistic prospect that plaintiff's application for a zoning variance would be successful. Even if this is not the case, plaintiff is fully able to seek an amendment to the CLDO. Until plaintiff has availed itself of these procedures,[18] the court cannot make a determination concerning the finality of the CLDO's application.

*Williamson*, in this court's view, requires more of plaintiff than cursory consideration (and summary rejection) of alternatives. Simply throwing one's hands up in frustration and crying "foul" is, under the circumstances, insufficient to prove that defendants made a "final" decision. Similar to the just compensation claims, *supra*, defendants summary judgment motion is **GRANTED** as to all due process taking claims.

3. Arbitrary and Capricious Due Process—Counts II, III, IV, and V

Several of plaintiff's claims (counts II through V) contest defendants' actions as arbitrary and capricious exercises of the police power—that the official actions do "not bear a substantial relation to the public health, safety, morals, or general welfare." *Eide*, 908 F.2d at 721.[19] Because there are two forms of this claim—as applied and facial—there are two distinct "ripeness" analyses.

---

16. The court does not have before it the letter notifying defendants of plaintiff's intention to make a claim based upon the road closing resolution. The only evidence offered in that respect was submitted by defendants in the form of Robin McGuffin's affidavit, which states, "Twiggs County did not receive any complaint or comment from Plaintiff regarding the closure of the road which ran across the landfill property until March 29, 1994, when attorneys for Plaintiff wrote to me asserting that James Emory, Inc. d/b/a Oco Resources was making a claim against Twiggs County because of the road closing." *See* McGuffin Aff., at ¶ 3. Plaintiff, although it submitted aerial photographs to rebut defendants' contention that public access existed, has not submitted any documentary evidence to rebut defendants' characterization. *See also supra* note 7.

17. Persistent refusal or failure to respond would, however, support an argument of "futility." *See Eide*, 908 F.2d at 726–27.

18. The court expresses no opinion as to whether plaintiff *could resort* to either, or *must resort* to both, to establish "finality". The facts surrounding an attempt to obtain a variance might in some cases be sufficient to establish finality, whereas in others it may be necessary to pursue an amendment as well.

19. This type of claim is also known as a "substantive due process" claim. *Eide*, 908 F.2d at 722 n. 9.

When a "facial" arbitrary and capricious challenge is lodged, the ripeness doctrine requires a demonstration that *"any application of the regulation is unconstitutional." Id.* at 724 n. 14. But for an "as applied" challenge, a claim is not ripe unless a plaintiff shows that "the particular zoning decision being challenged [has been] finally applied to the property at issue." *Id.* at 725. The finality requirement for arbitrary and capricious claims is not, however, synonymous with that conducted in "the due process takings and just compensation areas." *Id.* at 725 n. 16.

> [W]ith respect to an as applied arbitrary and capricious due process claim, the final decision hurdle is satisfied when ... the zoning decision being challenged is finally applied to the property. Thus, in an as applied arbitrary and capricious due process claim challenging a zoning decision denying commercial zoning, the landowner need only obtain a *final decision* denying commercial zoning.... Once the local authority has made a final decision denying commercial zoning to [plaintiff], [plaintiff's] as applied arbitrary and capricious due process claim will be ripe.

*Id.* (emphasis supplied). However, a decision that is final in the context of an "as applied" arbitrary and capricious claim may not be thus in "the due process takings and just compensation areas." *See id.* A two-step inquiry is necessary for determining whether a decision is final in the context of the latter. *Id.*[20] Only one of those two steps—that which asks whether the challenged ordinance has been finally applied—is employed to determine whether finality has been achieved for purposes of the former. *Id.*

In examining the finality requirement in the context of a just compensation claim, the Eleventh Circuit found that "[i]n most cases, no 'final decision' has been reached until an aggrieved landowner has applied for at least one variance to a contested zoning ordinance." *Reahard,* 30 F.3d at 1415. Although it is not clear whether the court in *Reahard* made this statement with an eye towards the second, "reapplication" prong of the *Williamson* finality inquiry, *see supra* note 20, such an interpretation seems highly unlikely.

In finding that *Williamson*'s finality inquiry did not contain a reapplication requirement in the arbitrary and capricious context, the Eleventh Circuit in *Eide* could not have meant to eliminate the fundamental principal of *Williamson, i.e.,* that "a zoning determination cannot be deemed final until the plaintiffs have applied for, and been denied, a variance." *Seguin v. City of Sterling Heights,* 968 F.2d 584, 587 (6th Cir.1992) (citing *Williamson,* 473 U.S. at 187–88, 105 S.Ct. at 3117).[21] Such an interpretation of the finality requirement in the as applied arbitrary and capricious context comports with the premise underlying all zoning challenges brought in federal court: " '[Z]oning is a delicate area where a county's power should not be usurped without giving the county an opportunity to consider concrete facts on the merits prior to a court suit.' " *Taylor Inv. Ltd. v. Upper Darby Township,* 983 F.2d 1285, 1291 (3d Cir.1993) (quoting *Eide,* 908 F.2d at 726 n. 17). *See also Hoehne v. County of San Benito,* 870 F.2d

---

**20.** The "final decision" inquiry for due process takings and just compensation claims contains these two steps: "First, the zoning decision must be finally made and applied to the property. Second, the local authority must have made all other decisions necessary for the court to determine whether the landowner has been deprived of substantially all economically beneficial value of the property." *Eide,* 908 F.2d at 725 n. 16. The second prong, which in most cases will necessitate a reapplication for less ambitious zoning by the plaintiff to determine the extent of development that would be allowed, is eliminated when determining finality for "as applied" arbitrary and capricious claims. *Id.* Thus where a just compensation or due process takings claim is found to be unripe by reason of

plaintiff's failure to establish the zoning decision's final application (as opposed to plaintiff's failure to satisfy the second prong), "as applied" arbitrary and capricious claims based upon the same challenged conduct are similarly unripe.

**21.** The court in *Eide* stated: "Thus, in an as applied arbitrary and capricious due process claim challenging a zoning decision *denying* commercial zoning, the landowner need only obtain a final decision *denying* commercial zoning." *Eide,* 908 F.2d at 725 n. 16 (emphasis supplied). A "denial" presupposes a "request." As a transitive verb, an object to be "denied" must exist.

529, 532 (9th Cir.1989) (*Williamson* and *MacDonald* "erected imposing barriers ... to guard against the federal courts becoming the Grand Mufti of local zoning boards").

Nor does such a requirement invariably favor zoning authorities. Landowners are always capable of demonstrating the futility of efforts at attaining a variance. *See Eide,* 908 F.2d at 726–27. If futility can be shown, the court's rule that at least one variance, special exception, or amendment be applied for is obviated. Without making at least one application for a variance a prerequisite for a finding of finality under *Williamson,* variance procedures in local zoning ordinances will become a nullity—aggrieved landowners could bring immediate challenge to the passage of a zoning ordinance on the basis that it is arbitrary and capricious "as applied", and without even having to make an initial attempt to convince the local authorities to rethink their position on the zoning. Such a result would entirely contradict the belief that zoning is an issue best resolved locally, and should only be addressed as a last resort by federal courts.

■ Applying these rules of law to the challenged conduct in this case, the court finds that the landfill resolution could not have been "finally" applied. Plaintiff has certainly not presented any evidence that it was applied. The only evidence before the court on the issue is the zoning letter, which said the landfill resolution did not apply to plaintiff's land. And to the extent that plaintiff claims the delay in issuing the letter harmed its efforts at obtaining an EPD permit, the rejection letters from EPD make patently clear that any prejudice resulted from plaintiff's own inadequacies. None of the deficiencies identified by those letters concerned a conflict with local zoning or land use plans. *See, e.g.,* Letters from James Dunbar to Patrick Hardie (11/2/1992 and 12/21/1992) (identifying application deficiencies).

■ Nor can plaintiff establish finality through the failure of the CLDO to explicitly provide for landfills when both variance and amendment procedures exist, plaintiff's pre-vious efforts at obtaining a zoning compliance letter were successful, and plaintiff has not applied for at least one variance. Although the CLDO adopted for Twiggs County does not provide for MSWL construction in any of the zoned areas, it cannot be said that this particular ordinance had been finally applied in an arbitrary and capricious manner until plaintiff has applied for at least one variance.[22] The elimination of *MacDonald*'s reapplication requirement did not relieve plaintiff of its burden to affirmatively demonstrate that he had applied for a variance, a special exception, or an amendment to the zoning ordinance. Plaintiff has not submitted affidavits that its past applications for variances were denied, that others' similar attempts were denied, or that defendants have indicated either explicitly or implicitly that an application would be rejected. *See supra* note 7. Nor does defendants' delay in issuing the zoning letter support a finding of futility.

■ The notice provided by plaintiff here—that it was "making a claim against Twiggs County because of the road closing"—is similarly deficient in this context to establish finality. Unless and until a request for reconsideration, etc., is made of the local official or board charged with the implementation of such resolutions, plaintiffs cannot say that the resolution has been finally applied to their property. *See supra* note 7. Making such a request, and thereby making possible a joint pursuit of conciliatory alternatives, comports with the notion that " 'zoning is a delicate area where a county's power should not be usurped without giving the county an opportunity to consider concrete facts on the merits prior to a court suit.' " *Upper Darby Township,* 983 F.2d at 1291 (quoting *Eide,* 908 F.2d at 726 n. 17).

Accordingly, plaintiff's arbitrary and capricious claims are not ripe. Defendants' summary judgment motion in this respect is **GRANTED.**

4. Equal Protection Challenges—Counts II and VII

■ Plaintiff states various claims— among them counts II and VII—based upon

---

**22.** *See supra* note 18.

the Fourteenth Amendment's Equal Protection Clause. Plaintiff argues that the resolution closing that portion of the road passing through defendant's tract of land did not afford it equal protection, that the landfill resolution is unreasonable and was adopted for an illegitimate purpose, that defendants failed to deal fairly with plaintiff and similarly situated owners, and that defendants decision not to cooperate with plaintiff to develop the landfill violated equal protection. Plaintiff's equal protection challenges are inextricably intertwined with its arbitrary and capricious due process claims.

Where a plaintiff's equal protection claims are based upon the same rationale as arbitrary and capricious claims, courts should employ the same ripeness analysis for both. *Eide*, 908 F.2d at 724 n. 12. Applying that ripeness standard, the court finds that the same reasons supporting dismissal of plaintiff's arbitrary and capricious claims supports dismissal in this context. Plaintiff's position—that defendants finally decided not to permit any landfills, through either the landfill resolution or the CLDO—is untenable, for reasons given previously. In regard to the landfill resolution, plaintiff is in possession of a letter certifying his compliance therewith. And in regard to the CLDO, variance and amendment procedures exist; plaintiff's past efforts at working with defendants were successful (plaintiff was issued a zoning letter certifying his compliance with pertinent zoning and land use ordinances); and, plaintiff has not lifted a finger to pursue either of those procedures. Finally, plaintiff's actions respecting the road closing resolution do not support a finding that defendants made a "final" decision in regard thereto.

Plaintiff's equal protection claims challenging defendants' zoning and land use decisions are not ripe. Defendants' summary judgment motion is **GRANTED** as to these claims.

*D. Antitrust—State Action Immunity*

In Count X, plaintiff claims that defendants have violated the antitrust laws.

This court has recently had numerous opportunities to consider the immunity of a state's political subdivisions from antitrust liability under the state action doctrine announced in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The test for determining the immunity's availability varies according to the nature of the defendant claiming it. Where a political subdivision of the state, a category inclusive of both municipalities and state-created authorities,[23] asserts the immunity,

> it will be entitled to the "state action" exemption upon a showing that it is authorized to act in an anticompetitive fashion pursuant to a "clearly articulated and affirmatively expressed" state policy. In the Eleventh Circuit, this means that the anticompetitive behavior was a foreseeable, or reasonably anticipated, outgrowth of the statute empowering the defendant to act within a sphere of influence.

\* \* \* \* \* \*

> Anticompetitive outcomes need not be the inevitable, or even the routine or ordinary result of the power specifically granted an authority; therefore, broad and expansive grants of power within a specified field and for a particular purpose may be fairly construed to contemplate that an authority might displace competition in a specific product market.

*Crosby v. Hospital Authority of Valdosta*, 873 F.Supp. 1568, 1575, 1578 (M.D.Ga.1995) (citations omitted):

> More specifically, the court has analyzed Georgia's statutory scheme authorizing municipalities to conduct waste collection and disposal services. In *Pine Ridge Recycling, Inc. v. Butts County*, 855 F.Supp. 1264, 1271 (M.D.Ga.1994), the court found that "[a]rguably, Georgia's grant of power to its solid waste authorities is comparable to [similar schemes satisfying the test of foreseeability]." However, the court then interpreted the recent Supreme Court case of *C & A Carbone, Inc. v. Clarkstown*, —— U.S. ——,

---

**23.** *See Askew v. DCH Regional Health Care Authority*, 995 F.2d 1033, 1037 (11th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 603, 126 L.Ed.2d 568 (1993) (cataloging various district court and appellate opinions finding state-created authorities to be municipalities for purposes of state action exemption).

114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), to say that the Commerce Clause prevented a state from delegating to its municipalities the ability to exclude entities such as Pine Ridge from the solid waste disposal market. Thus, if Georgia had in fact authorized municipalities to "exclude plaintiffs from the solid waste disposal market, then the Georgia statute would conflict with the Commerce Clause as interpreted by the United States Supreme Court in *Carbone.*" *Pine Ridge,* 855 F.Supp. at 1271. Butts County was therefore not shielded by the *Parker* doctrine.

Upon further consideration, the court finds that the wording employed by it to describe the holding in *Carbone* is potentially overbroad. While this court reaffirms in every aspect the continuing validity of its·decision in *Pine Ridge,* several limitations on the potential breadth of its application should be made known. As an initial matter, the court notes that the Sherman Act was passed by Congress pursuant to the authority granted it by the Commerce Clause. *United States v. Lopez,* —— U.S. ——, ——, 115 S.Ct. 1624, 1627, 131 L.Ed.2d 626 (1995) (Rehnquist, C.J.); *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 358, 107 S.Ct. 720, 733, 93 L.Ed.2d 667 (O'Connor, J., dissenting). Whereas the Commerce Clause is an affirmative "grant" of power to the federal government, it is also by negative implication a "restriction" on states' power to act in a manner discriminating against interstate commerce. The Sherman Act is merely one specific application of this broad "grant" of power, which reflects a policy choice that markets free of monopolistic forces operate more effectively.

■■■ Thus, three possibilities exist when challenging a state's conduct as anticompetitive or monopolistic: the state action might (1) violate the Sherman Act's prohibitions

(interstate commerce should be free of monopolistic forces, *see, e.g., Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 398–400, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364 (1978)); or (2) contradict the negative implication of the Commerce Clause (states cannot act in a way that discriminates against interstate commerce, *see, e.g., Fort Gratiot Landfill, Inc. v. Michigan Dept. of Natural Resources,* 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992)); or (3) transgress the boundaries of both the statutory and constitutional prohibitions. Furthermore, the fact that a municipality's actions technically constitute a Sherman Act violation [24] does not mean *a fortiori* that the challenged conduct violates the dormant Commerce Clause as well. For,

> the monopolistic character of a [local ordinance's] effects is not itself suspicious for purposes of the Commerce Clause. Although the right to compete is a hallmark of the American economy and legal monopolies are subject to challenge under the century-old Sherman Act, the bar to monopolies (or, rather, the authority to dismember and penalize them) arises from a statutory, not a constitutional mandate. No more than the Fourteenth Amendment, the Commerce Clause "does not enact Mr. Herbert Spencer's Social Statistics ... [or] embody a particular economic theory, whether of paternalism ... or of *laissez-faire.*"

*Carbone,* —— U.S. at ——, 114 S.Ct. at 1699, 128 L.Ed.2d at 428 (footnote omitted) (Souter, J., dissenting).

Whether a state's action has invaded the province of the dormant Commerce Clause, and whether that same action violates the Sherman Act, are separate and distinct inquiries.[25] The former inquiry necessitates ref-

---

24. Technical, because of *Parker* immunity.

25. For example, the remedies for these violations are entirely distinct. Where the dormant Commerce Clause has been violated, the remedy is simply a declaration of unconstitutionality, with perhaps an award of damages, injunctive relief, and/or attorney fees under 42 U.S.C. §§ 1983 and 1988. *See, e.g., Dennis v. Higgins,* 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (suits on basis of violation of Commerce Clause may be brought pursuant to § 1983); *Geowaste of Geor-*

*gia, Inc. v. Tanner,* 875 F.Supp. 830 (M.D.Ga. 1995) (award of attorney fees under § 1988 for dormant Commerce Clause plaintiff). However, the remedy for a Sherman Act violation is generally treble damages, along with the costs of suit. *See* 15 U.S.C. § 15.

Additional distinctions between the two become apparent upon a consideration of the immunities available under each. When a dormant Commerce Clause challenge is lodged under § 1983, qualified and absolute immunity general-

erence to cases such as *Carbone* and others which comprise dormant Commerce Clause jurisprudence: *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); and *South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). *See also United States v. Lopez*, —— U.S. ——, ——, 115 S.Ct. 1624, 1626, 131 L.Ed.2d 626 (1995) (describing genesis of dormant Commerce Clause jurisprudence). The latter, of course, relies upon *Parker* and its progeny: *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (two-pronged test for political subdivisions to assert state action immunity); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) (two-prong political subdivision test reduced to single prong); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (immunity extended to private persons authorized to act anticompetitively by state upon satisfaction of dual-element *City of Lafayette* test); and *Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988) (state must exercise "ultimate control" over political subdivision's anticompetitive conduct to satisfy single element *Hallie* test). These two very different inquiries, and the quite distinct

lines of cases developing them will not produce identical results in every situation.

Turning to the court's opinion in *Pine Ridge*, the court had found that the municipality's actions violated the Commerce Clause as interpreted by *Carbone*. *Pine Ridge*, 855 F.Supp. at 1275. The dormant Commerce Clause, pleaded by the plaintiff as the source of a cause of action, provided a limitation upon the actions in which defendants might engage. The court then construed the statute empowering municipalities in Georgia to act anticompetitively as falling short of authorizing conduct that would permit a municipality to engage in the same conduct which it had found violated the dormant Commerce Clause. In the absence of a valid delegation, *Parker*'s foreseeability test could not be satiated. Thus were the municipal defendants subject to antitrust liability.

To the extent that the court's language regrettably implies that *Carbone* precludes *all* delegations of monopolistic power in the solid waste disposal market, the court now clarifies itself by stating that *Carbone* precludes only those delegations which invade the boundaries drawn by the dormant Commerce Clause.[26] Although the Sherman Act was hewn from the block of authority granted Congress by the Commerce Clause, the dormant Commerce Clause does not sub-

---

ly preclude the award of money damages against state and local legislators. *See, e.g., Smith v. Lomax*, 45 F.3d 402, 405 (11th Cir.1995) (absolute and qualified immunity for local legislators). However, antitrust actions are subject to a distinct variety of immunity defenses, including the *Parker* doctrine (immunity from injunction and money damages) and the Local Government Antitrust Immunity Act ("LGAA"), 15 U.S.C. §§ 34–36 (precluding damages award).

However, the two causes of action do have their similarities. For example, the *Parker* doctrine is firmly rooted in "principles of federalism and state sovereignty." *F.T.C. v. Hospital Board of Directors of Lee County*, 38 F.3d 1184, 1187 (11th Cir.1994). Similarly, the otherwise extensive reach of the Commerce Clause must remain tempered

in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national

and what is local and create a completely centralized government.

*United States v. Lopez*, —— U.S. ——, ——, 115 S.Ct. 1624, 1628, 131 L.Ed.2d 626 (1995).

**26.** The only challenge to the local ordinance in *Carbone* was made through the dormant Commerce Clause: "Indeed, other flow control ordinances have been challenged under the Sherman Act, although without success where municipal defendants have availed themselves of the state action exception to the antitrust laws.... That [state law] authorizes [the defendant's] flow control ordinance may explain why no Sherman Act claim was made here." *Carbone*, —— U.S. —— n. 13, 114 S.Ct. at 1699 n. 13, 128 L.Ed.2d at 428 n. 13 (Souter, J., dissenting) (citations omitted).

As has been stated, whether a statutory delegation violates the dormant Commerce Clause is wholly separate from the question of whether a municipality's action pursuant to the delegation is entitled to *Parker* immunity. *See supra* note 25.

sume antitrust liability and immunities therefrom—a transgression of one is not the equivalent of breaching both.

 With the foregoing in mind, the court begins its analysis of *Parker* immunity in the case *sub judice* by noting that plaintiff has not raised any Commerce Clause challenges. And before *Carbone* will ever apply to a case, a plaintiff must plead a violation of the Commerce Clause. Accordingly, all delegations of monopolistic authority are presumed valid for purposes of the dormant Commerce Clause.[27] The court now turns to the question of whether the statute's delegation satiates *Parker*'s foreseeability requirement.

The Georgia Comprehensive Solid Waste Management Act ("GCSWMA"), O.C.G.A. §§ 12–8–20 to 12–8–59.1 (1992 & Supp.1994), although specifically contemplating participation by private market entrants, clearly endorses anticompetitive behavior by solid waste management authorities, whether they be constituted for one or several counties. In *McCallum v. City of Athens, Georgia*, 976 F.2d 649, 654 (11th Cir.1992), the Eleventh Circuit Court of Appeals affirmed this court's determination that O.C.G.A. § 36–34–5 contained a clear and affirmative expression to displace competition with regulation in regard to the operation and maintenance of water and sewage systems. More recently, this court found a "clear and affirmative expression" for purposes of state action immunity in the context of credentialling decisions by municipally owned and operated hospitals. *Crosby v. Hospital Auth. of Valdosta*, 873 F.Supp. 1568, 1580 (M.D.Ga.1995) (interpreting Georgia's Hospital Authorities Law as authorizing anticompetitive conduct).

In the case *sub judice*, the court need look no further than O.C.G.A. § 12–8–51(b) to ferret out Georgia's policy:

It is the express policy of the State of Georgia that *any authority created by this part shall be authorized* with respect to any solid waste which the generator thereof, county, or municipal corporation makes available to such authority *to enter into agreements in furtherance of a project granting, directing, or providing for an exclusive right or rights in any authority* with respect to such solid waste, including, but not limited to, the exclusive right to collect, acquire, receive, transport, store, treat, process, utilize, sell, or dispose of discarded solid waste. . . .

(emphasis supplied). Whereas the courts in *McCallum* and *Crosby* were forced to look to the results that would flow from the particular statutory provisions, the court in this case need look only to the statutory language itself—solid waste management authorities in Georgia may enter agreements in furtherance of projects providing for "exclusive" rights regarding solid waste. The ability to enter agreements granting exclusive rights, coupled with the extensive regulatory oversight established by the GCSWMA and the Regional Solid Waste Management Authorities Act ("RSWMAA"), lead the court to conclude that municipal defendants acting pursuant to that statutory authorization are shielded from federal antitrust liability by the state action exemption doctrine an-

---

**27.** The court expresses no view on the viability of a Commerce Clause challenge in this case, except insofar as the court notes that this case seems factually distinct from *Carbone*. First, in *Carbone* "the town ha[d] created a monopoly on trash processing services, and residents [we]re no longer free to provide these services for themselves or to contract for them with others at a mutually agreeable price." *Carbone*, —— U.S. at ——, 114 S.Ct. at 1693, 128 L.Ed.2d at 422 (Souter, J., dissenting). Thus residents were bound to pay a price if they wished to ship their refuse elsewhere for disposal—*solid waste was precluded from entering interstate commerce without first being processed at the local facility. Id.* at ——, 114 S.Ct. at 1680, 128 L.Ed.2d at 405 (flow control ordinances require "all solid waste

to be processed at a designated transfer station before leaving the municipality").

By contrast, Twiggs County has erected no such barriers. Residents may freely transport their refuse out of county to deposit it with any processor they desire, and without having to first pay a fee before leaving the county. Upon cursory inspection, the court fails to see how defendants' action either discriminates against interstate commerce, *see Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), or places a burden upon interstate commerce that is clearly excessive in relation to the local benefits derived therefrom, *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

nounced in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

Because defendants are immune under *Parker,* defendants are **GRANTED SUMMARY JUDGMENT** on plaintiff's antitrust claims.[28]

### F. Abstention

Because none of plaintiff's federal claims remain, the only claims left before the court are based upon state law. Pursuant to 28 U.S.C. § 1367(c), the court declines to continue the exercise of supplemental jurisdiction over these state-based claims and accordingly **DISMISS ALL PENDENT STATE CLAIMS.** *See Crosby v. Hospital Authority of Valdosta,* 873 F.Supp. 1568, 1584 (M.D.Ga. 1995).

## III. CONCLUSION

To summarize, Counts II and IV were not ripe because, since they were "as applied" arbitrary and capricious due process claims, there must have been a final application of the challenged rule. That was not the case, and ripeness dictates that the court grant defendants' summary judgment motion. Counts III, V, and VI, regardless of the taking category in which they fell, fail on account of ripeness. Summary judgment in defendants' favor is thus appropriate on that score as well. Count V is likewise insufficient to the extent that it is predicated upon the notion that notice was due plaintiff as a landowner. Count VII, as an as applied equal protection challenge, is similarly not ripe and must fall to defendants' summary judgment motion. The court grants defendants summary judgment as to Counts I, VII, and IX because their continued viability was dependent upon proof of one of the foregoing constitutional claims. Without a predicate violation, those claims must fall victim to defendants' summary judgment. Defendants are entitled to summary judgment on Count X on account of the *Parker* doctrine, which immunizes defendants from

money damages and injunctive relief. Having granted summary judgment as to these federal claims, the court dismisses all remaining pendent state claims. The court found it unnecessary to address defendants' remaining defenses identified by this order.

Let judgment, therefore, be entered for the defendants on all claims.

**SO ORDERED.**

---

**28.** The court notes as an aside that for an antitrust plaintiff to prevail, he must demonstrate that he is prepared to enter the market. The court doubts, in light of the plaintiff's numerous failed attempts at EPD approval, that plaintiff could satisfy this requirement. *See Pine Ridge Recycling, Inc. v. Butts County, Ga.,* 855 F.Supp. 1264, 1271–72 (M.D.Ga.1994) (citing *Jayco Systems v. Savin Business Mach. Corp.,* 777 F.2d 306, 314 (5th Cir.1985)).